T.C. Memo. 2014-161

UNITED STATES TAX COURT

MARCO ZARLENGO AND LINDA MCMAHON-ZARLENGO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MERILYN H. SANDIN-ZARLENGO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 3701-10, 26747-10.           Filed August 11, 2014.

Z and then spouse S sought to contribute a facade conservation easement on their property to the National Architectural Trust (Trust). Z and S obtained an appraisal claiming the value of the conservation easement to be $660,000 as of July 26, 2004. On or before September 22, 2004, Z, S, and the Trust all signed a conservation deed of easement. However, the deed was not recorded until January 26, 2005.

Z and S each claimed a charitable contribution deduction of $330,000 for the conservation easement on their separately filed 2004 tax returns. Because of applicable gross income limitations on charitable contribution deductions, <u>see</u> I.R.C. sec. 170(b)(1)(B), Z and S were able to use only part of the deduction for 2004 and they carried the excess forward. R issued a notice of deficiency to Z for

[*2] 2004 and a notice of deficiency to S for 2005-07 disallowing the charitable contribution deductions.

Held: The conservation easement was not protected in perpetuity until January 26, 2005.

Held, further, Z is not entitled to a deduction for the conservation easement for 2004.

Held, further, S substantially complied with the substantiation requirements with respect to the conservation easement, notwithstanding the premature nature of the appraisal.

Held, further, the fair market value of the conservation easement is $157,500 as of January 26, 2005. S is entitled to a deduction of $78,750 for 2005.

Held, further, Z and S meet the reasonable cause and good faith exception to the accuracy-related penalties for 2004 and 2005, respectively.

Held, further, S is liable for gross valuation misstatement penalties for 2006 and 2007.


Frank Agostino, Jairo G. Cano, and Jeremy M. Klausner, for petitioners.

Marc L. Caine and Eliezer Klein, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


VASQUEZ, Judge: The issues for decision in these consolidated cases are

(1) whether petitioners are entitled to noncash charitable contribution deductions

[*3] under section 170 with respect to the donation of a facade conservation easement (conservation easement) to the National Architectural Trust (Trust) and (2) whether petitioners are liable for accuracy-related penalties under section 6662(h) or (a).[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated herein by this reference. At the time they filed the petitions, petitioners resided in New York.

On October 7, 1975, petitioners Marco Zarlengo and Merilyn H. Sandin-Zarlengo purchased a four-story townhouse (townhouse) at 309 West 80th Street on the Upper West Side of Manhattan for $150,000.[2] The townhouse had been built in the 1890s and, like many of the other townhouses in the neighborhood, was in dire need of repair. Petitioners undertook a complete restoration of the townhouse using materials designed to preserve its historic character. Their neighbors soon followed suit.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Linda McMahon-Zarlengo is a party to this case by virtue of having filed a joint return with Marco Zarlengo for 2004. All references hereafter to petitioners are to Marco Zarlengo and Merilyn H. Sandin-Zarlengo.

**[*4]** I.        <u>The Landmarks Preservation Commission</u>

The New York City Landmarks Preservation Commission (LPC) took notice. One of the functions of the LPC is to identify new potential historic districts and landmarks. On March 26, 1985, the LPC designated petitioners' neighborhood as the "Riverside Drive - West 80th-81st Street Historic District" (Riverside Historic District). As a result of this designation, the townhouse fell under the LPC's jurisdiction.

The primary function of the LPC is to regulate historic districts and landmarks under its jurisdiction. The LPC does this through two sets of regulations--the administrative code (LPC code) and the Rules of the City of New York (LPC rules). The LPC code is for the most part static, while the LPC rules change approximately every two years.

The normal standard of maintenance for a building under the LPC's jurisdiction is "good repair". This means that significant architectural features of the building must be kept intact. It does not mean that the building must be kept in pristine condition. Certain buildings are subject to a heightened standard of maintenance known as "sound first class condition". An owner of a building will typically receive a special zoning permit in exchange for agreeing to restore and

**[\*5]** maintain a building in sound first class condition.  The townhouse is subject to the good repair standard.

The LPC does not actively monitor buildings subject to the good repair standard.  The LPC instead relies on the local community to report violations of the LPC rules directly to the LPC.  The LPC has three or four employees dedicated to enforcement.  The LPC has the authority to issue a "stop work order" to a building owner who is doing work without a permit, and it may impose sanctions, including fines, for violations of the LPC rules.  The LPC does not have the right to enter a building subject to the good repair standard in order to correct a violation, but it may seek a court order compelling a building owner to make necessary repairs.

## II.     The Trust

On February 3, 1999, petitioners divorced.  Dr. Zarlengo moved out of the townhouse, but he and Ms. Sandin-Zarlengo each retained an interest in the townhouse.  Sometime after the divorce, Ms. Sandin-Zarlengo learned about the Trust from her neighbors.  The Trust is a nonprofit organization whose mission is to "preserve historic architecture in the United States".  The Trust advances its mission primarily through acquiring conservation easements on historic

[*6] properties.[3]  Unlike the LPC, the Trust actively monitors all of the properties on which it owns an easement through annual inspections.  The Trust evaluates proposed changes to easement-encumbered properties using the standards promulgated by the Secretary of the Interior, see 36 C.F.R. Part 67, and has a variety of potential legal options should the terms of one of its easements be violated.

Ms. Sandin-Zarlengo believed that donating a conservation easement on the townhouse to the Trust was a great way to support conservation on a national level.  She brought the idea to Dr. Zarlengo's attention.  He, too, was intrigued by the idea.  After meeting with a representative of the Trust, petitioners decided to move forward with the donation.

On March 11, 2004, petitioners submitted to the Trust a document titled "Facade Conservation Easement Application".  Petitioners stated the estimated fair market value of the townhouse as $5.5 million on the document.  On June 30, 2004, the U.S. Department of the Interior, National Park Service, certified that the townhouse "contributes to the significance of the * * * [Riverside Historic District] and is a 'certified historic structure' for a charitable contribution for

---

[3] The Trust also engages in educational outreach and gives grants to other nonprofit organizations with similar missions.

[*7] conservation purposes in accordance with the Tax Treatment Extension Act of 1980."

On July 12, 2004, the Trust sent petitioners a letter stating that the Trust had received all necessary approvals to complete petitioners' application to donate the conservation easement. The letter directed petitioners to obtain an appraisal of the conservation easement. The Trust enclosed with the letter a list of qualified appraisers in petitioners' area.

Petitioners selected Jerome Haims of Jerome Haims Realty, Inc., to appraise the conservation easement. Mr. Haims is a certified real estate general appraiser in New York. He determined the "market value" of the townhouse to be $6 million as of July 26, 2004. He then applied an 11% diminution to the market value of the townhouse to arrive at a value of $660,000 for the conservation easement.

Mr. Haims prepared an appraisal report dated August 24, 2004, with an effective date of July 26, 2004 (appraisal report). Jean Hao, an employee of Mr. Haims' company, performed a physical inspection of the townhouse and assisted Mr. Haims in the preparation of the appraisal report. The appraisal report includes a detailed description of the townhouse complete with photographs of its interior, exterior, and surroundings. The appraisal report states that its intended use "is to assist our client [Ms. Sandin-Zarlengo] in determining the Federal tax benefits

**[*8]** resulting from the creation of the subject's [townhouse's] historic preservation easement." Mr. Haims attached a copy of a "Conservation Deed of Easement" (sample deed) to the appraisal report. The sample deed was the standard deed that the Trust used at the time. It had a few blank lines for a donor's personal information.

On or about August 24, 2004, Mr. Haims provided Ms. Sandin-Zarlengo with a copy of the appraisal report. Also on August 24, Mr. Haims sent the Trust a copy of the appraisal report and a Form 8283, Noncash Charitable Contributions (appraisal summary). On part 1 of the appraisal summary, Information on Donated Property, Mr. Haims checked the box for "Real Estate" in response to the inquiry "Check type of property". He described the property as "309 West 80th Street" and as a "Historic Preservation Easement". He listed the appraised fair market value of the property as $660,000. He signed part 3 of the appraisal summary, Declaration of Appraiser, under penalties of perjury and listed the date of his appraisal as July 26, 2004.

On August 31, 2004, the Trust sent petitioners a letter stating that it had received a copy of the appraisal report. The Trust enclosed with the letter a number of documents, including a "Conservation Deed of Easement" (conservation deed). The enclosed conservation deed was identical in all material

**[\*9]** respects to the sample deed that Mr. Haims had attached to the appraisal report, except for the fact that the blanks had been filled in with information pertaining to petitioners' donation (i.e., petitioners' names, the address of the townhouse, the identification of the Riverside Historic District, etc.).  The Trust requested that petitioners execute and return the enclosed documents on or before September 17, 2004,[4] and provide a check to the Trust for the remainder of their agreed-upon cash donation.[5]

On September 10, 2004, petitioners signed the conservation deed and had it notarized.  On September 22, 2004, a duly authorized representative of the Trust signed the conservation deed on behalf of the Trust.  That same day the Trust completed part 4 of the appraisal summary, Donee Acknowledgment.  On December 10, 2004, the Trust mailed petitioners a letter thanking them for their cash donation and their donation of the conservation easement.  The Trust

---

[4]  The letter specifically stated:  "Please note that your easement donation must be closed within sixty days of the date of your appraisal, which is dated July 26, 2004.  Therefore, the <u>executed documents</u> listed above must be received by the Trust on or before September 17, 2004."

[5]  The Trust generally requires that easement donors make a cash contribution of approximately 10% of the value of an easement.  The Trust uses the cash contributions to fund its operating expenses.

[*10] enclosed the completed appraisal summary with the letter.[6]  The letter stated in pertinent part:

> Enclosed is a copy of IRS Form 8283 executed by the appraiser and the Trust.  This Form is to be included in your income tax submission for the year 2004.  Please keep it in a safe and readily available place so that you can provide it to the person who prepares your taxes.
>
> Once your recorded deed is returned to our office, we will forward a copy to you for your records.  We very much enjoyed working with you and once again, thank you for your generous gifts.

On January 26, 2005, the New York City Department of Finance, Office of the City Register, recorded and filed the conservation deed.

III.    Sale of the Townhouse

On June 12, 2003, petitioners entered into an agreement with Leslie J. Garfield & Co., Inc. Real Estate (Leslie J. Garfield) to list the townhouse for sale. Dr. Zarlengo was no longer living in the townhouse at the time, but he continued to pay between $10,000 and $11,000 per month to maintain the townhouse.  His motivation in selling the townhouse was to eliminate this monthly expense and to provide for his and Ms. Sandin-Zarlengo's retirement.  Richard Pretsfelder, a broker with Leslie J. Garfield, was petitioners' agent.

---

[6]  The appraisal summary has four parts.  Mr. Haims completed parts 1 and 3, and the Trust completed part 4.  Part 2, Taxpayer (Donor) Statement, applies to items having a value of $500 or less.

**[*11]** Mr. Pretsfelder listed the townhouse for sale on June 16, 2003. He drafted a "setup" of the townhouse, which is a marketing tool that provides a brief summary of the property. He mailed the setup to brokers, homeowners, and other interested parties.

The setup stated an asking price of $5.5 million for the townhouse. Mr. Pretsfelder believed that the asking price was too high relative to other properties on the market, but he did not lower it at any point because petitioners had set the asking price. Mr. Pretsfelder did not update the setup after the conservation easement was donated because it was not something that he would normally flag in marketing materials.

The real estate market in Manhattan was trending upward in 2004, and it continued to do so through 2007. On November 20, 2007, petitioners, through Mr. Pretsfelder, sold the townhouse to Gregory Astrachan and Jacqueline Clements (buyers) for $4,650,500. The sale price was negotiated between Mr. Pretsfelder and the buyers' broker. At the time the sale price was negotiated, the buyers had plans to significantly modify the townhouse, but neither the buyers nor their broker had knowledge of the conservation easement. When the buyers learned of the conservation easement, they had conversations with the Trust regarding their plans to modify the townhouse. However, they did not lower their

[*12] offer because the conservation easement did not affect their plans and they wanted to honor their agreement.

On June 5, 2008, the LPC issued a certificate of appropriateness approving the buyers' plans to modify the townhouse. In addition to the LPC's approval, the buyers had to get the Trust's approval. On October 21, 2008, the buyers submitted a "Proposed Modification Request" form to the Trust, along with the LPC's certificate of appropriateness, architectural drawings, and photographs of the proposed modifications. On November 5, 2008, the Trust mailed the buyers a letter responding to their Proposed Modification Request. The Trust stated in the letter that it did "not object" to the proposed modifications to the front of the townhouse because, on the basis of the Trust's assessment, the modifications "will not be inconsistent with the historic character of the * * * [townhouse] and are consistent with the terms and purpose of the Easement." The Trust further stated that it "would object" to the modifications to the rear of the townhouse if it had jurisdiction because these modifications would irreversibly change the footprint of the townhouse.

IV.    Petitioners' Tax Returns

Dr. Zarlengo and Ms. McMahon-Zarlengo timely filed a joint Federal income tax return for 2004 on Form 1040, U.S. Individual Income Tax Return. On

[*13] the return they reported a noncash charitable contribution deduction of $330,000, representing one-half of the fair market value of the conservation easement as reported on the appraisal report. They also reported a cash charitable contribution deduction of $31,350, representing one-half of the cash petitioners had donated to the Trust in 2004. Dr. Zarlengo and Ms. McMahon-Zarlengo were able to use only part of the $330,000 deduction for 2004 because of applicable gross income limitations on charitable contribution deductions, see sec. 170(b)(1)(B), and they carried the excess forward to other taxable years. The only year at issue for Dr. Zarlengo and Ms. McMahon-Zarlengo is 2004.

Ms. Sandin-Zarlengo also reported a noncash charitable contribution deduction of $330,000 and a cash charitable contribution deduction of $31,350 (representing her 50% share) on her 2004 Federal income tax return. She, too, was able to use only part of the $330,000 deduction for 2004 and carried the excess forward. However, 2004 is not at issue for Ms. Sandin-Zarlengo as it is for Dr. Zarlengo and Ms. McMahon-Zarlengo. The years at issue for Ms. Sandin-Zarlengo are 2005-07, the years for which she claimed carryforward noncash charitable contribution deductions flowing from the $330,000 deduction she originally reported for 2004.

[*14] Leonard Cirillo of the accounting firm Cirillo, Francis & Cirillo Certified Public Accountants, LLP, prepared the joint 2004 return for Dr. Zarlengo and Ms. McMahon-Zarlengo and the individual 2004-07 returns for Ms. Sandin-Zarlengo. Mr. Cirillo had been preparing tax returns for petitioners since 1997 and continued to do so after the years in issue. He is a licensed certified public accountant (C.P.A.) in New York. He had approximately 20 years of experience in accounting at the time he prepared the 2004 returns.

Mr. Cirillo first heard of the conservation easement deduction from Dr. Zarlengo. Dr. Zarlengo had stopped by Mr. Cirillo's office to inquire whether such a deduction was legitimate. This occurred before petitioners had met with a representative of the Trust. Mr. Cirillo agreed to look into it. He then read an article on conservation easements in the Journal of Accountancy written by a C.P.A. and researched the relevant substantiation requirements.[7] Mr. Cirillo called Dr. Zarlengo on the phone and explained that the deduction was legitimate and that petitioners would need to obtain an appraisal and Forms 8283 to attach to their tax returns. It was only after hearing back from Mr. Cirillo that Dr. Zarlengo asked Ms. Sandin-Zarlengo to pursue the donation further.

---

[7] Mr. Cirillo believes that he consulted the Master Tax Guide for the substantiation requirements.

[*15] Dr. Zarlengo does not have a background in tax, finance, or accounting. When it came time to file his tax return each year, he would collect any and all relevant documents in his possession, place them in an envelope, and give the envelope to Mr. Cirillo in person. Likewise, Ms. Sandin-Zarlengo does not have a background in tax, finance, or accounting. Dr. Zarlengo provided Mr. Cirillo with some of the documents needed to prepare Ms. Sandin-Zarlengo's return (even after they were divorced), and Ms. Sandin-Zarlengo provided additional documents and information to Mr. Cirillo by fax, email, or telephone.

Dr. Zarlengo provided Mr. Cirillo with the appraisal report, the appraisal summary, and the conservation deed. On the basis of his earlier research and his review of these documents, Mr. Cirillo felt comfortable that petitioners had sufficiently substantiated the deductions. Furthermore, nothing in these documents gave Mr. Cirillo cause for concern as to the accuracy of Mr. Haims' appraised values. Mr. Cirillo signed Dr. Zarlengo's 2004 return and Ms. Sandin-Zarlengo's 2004-07 returns under penalties of perjury believing the returns to be true and correct.

V.    Notices of Deficiency

On November 25, 2009, respondent mailed Dr. Zarlengo and Ms. McMahon-Zarlengo a notice of deficiency for 2004. Respondent determined a

**[\*16]** deficiency of $11,773 which is attributable to his disallowance of both the deduction for the conservation easement and the deduction for the cash donation to the Trust. Respondent also determined a penalty of $1,574 under section 6662(h) with respect to the conservation easement (and alternatively a penalty under section 6662(a)) and a penalty of $1,117 under section 6662(a) with respect to the cash donation. Respondent has since conceded that Dr. Zarlengo and Ms. McMahon-Zarlengo are entitled to the deduction for the cash donation and are not liable for the section 6662(a) penalty with respect to the cash donation.

Also on November 25, 2009, respondent mailed Ms. Sandin-Zarlengo a notice of deficiency for 2005, 2006, and 2007. Respondent determined a deficiency of $8,938 for 2005, $10,003 for 2006, and $39,590 for 2007 all of which are attributable to his disallowance of carryforward charitable contribution deductions stemming from the conservation easement. Respondent determined penalties of $3,575 for 2005, $4,001 for 2006, and $15,836 for 2007 under section 6662(h) (and alternatively penalties under section 6662(a)).

Dr. Zarlengo and Ms. McMahon-Zarlengo timely filed a petition in response to the notice of deficiency for 2004. Ms. Sandin-Zarlengo timely filed a petition in response to the notice of deficiency for 2005-07. We consolidated the cases. We must now decide whether petitioners are entitled to any of the disputed

[*17] deductions they claimed for their donation of the conservation easement and whether they are liable for any of the disputed penalties respondent has determined.

OPINION

I.   Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and a taxpayer bears the burden of proving that the Commissioner's determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The burden of proof on factual issues that affect a taxpayer's liability for tax generally may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue." Sec. 7491(a)(1); see also Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001). Petitioners argue that the burden shifts to respondent under section 7491(a). Respondent disagrees and argues that petitioners have not satisfied the requirements of section 7491.

The party whose position is supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion. See Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212. Consequently, a shift in the burden of persuasion "'is of practical consequence

[*18] only in the rare event of an evidentiary tie.'" Id. (quoting Polack v. Commissioner, 366 F.3d 608, 613 (8th Cir. 2004), aff'g T.C. Memo. 2002-145). We decide these cases on the weight of the evidence presented instead of on an allocation of the burden of proof and thus need not decide whether the burden of proof has shifted.

II.    Conservation Easements in General

A taxpayer is generally allowed a deduction for any charitable contribution made during the taxable year. Sec. 170(a)(1). A charitable contribution includes a gift of property to a charitable organization, made with charitable intent and without the receipt or expectation of receipt of adequate consideration. See Hernandez v. Commissioner, 490 U.S. 680, 690 (1989); United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986); see also sec. 1.170A-1(h)(1) and (2), Income Tax Regs. While a taxpayer is generally not allowed a charitable contribution deduction for a gift of property consisting of less than an entire interest in that property, an exception is made for a "qualified conservation contribution." See sec. 170(f)(3)(A), (B)(iii).

A "qualified conservation contribution" is a contribution (1) of a "qualified real property interest" (2) to a "qualified organization" (3) which is made "exclusively for conservation purposes." Sec. 170(h)(1); see also sec.

**[*19]** 1.170A-14(a), Income Tax Regs. Respondent argues that petitioners are not entitled to a deduction for their contribution of the conservation easement because the conservation easement was not a qualified real property interest nor was it made exclusively for conservation purposes.[8]

A. General Rules on Perpetuity

Section 170(h)(2) defines "qualified real property interest" as:

any of the following interests in real property:

(A) the entire interest of the donor other than a qualified mineral interest,

(B) a remainder interest, and

(C) a restriction (granted in perpetuity) on the use which may be made of the real property.

Section 1.170A-14(b)(2), Income Tax Regs., provides the following with respect to section 170(h)(2)(C):

A "perpetual conservation restriction" is a qualified real property interest. A "perpetual conservation restriction" is a restriction granted in perpetuity on the use which may be made of real property--including, an easement or other interest in real property that under state law has attributes similar to an easement (e.g., a restrictive covenant or equitable servitude). * * *

---

[8] Respondent does not dispute that the Trust is a qualified organization.

[*20] Like section 170(h)(2)(C), section 170(h)(5) specifies that the conservation purpose must be protected in perpetuity. Section 170(h)(5)(A) provides that "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." Although paragraphs (2)(C) and (5) both require perpetuity, they are separate and distinct requirements. Section 170(h)(2)(C) specifies that the donated interest in real property must be subject to a use restriction in perpetuity, whereas section 170(h)(5) specifies that the conservation purpose of a conservation easement must be protected in perpetuity. Belk v. Commissioner, 140 T.C. 1, 12 (2013); sec. 1.170A-14(a), Income Tax Regs. A restriction granted in perpetuity on the use of the property must be based upon legally enforceable restrictions (such as by recording the deed) that will prevent uses of the retained interest in the property that are inconsistent with the conservation purpose of the contribution. See sec. 1.170A-14(g)(1), Income Tax Regs.

B.    Conservation Easements in New York

In a Federal tax controversy, State law controls the determination of a taxpayer's interest in property while the tax consequences are determined under Federal law. United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985); Woods v. Commissioner, 137 T.C. 159, 162 (2011). Therefore, New York law

[*21] governs when petitioners' donation of the conservation easement is regarded as complete, and Federal tax law determines the tax consequences.

Under New York law, an instrument purporting to create, convey, modify, or terminate a conservation easement is not effective unless recorded. N.Y. Envtl. Conserv. Law (NYEC Law) sec. 49-0305(4) (McKinney 2008 & Supp. 2014). In Rothman v. Commissioner, T.C. Memo. 2012-163, slip op. at 30, we stated that "[i]nsofar as New York law does not regard an easement contribution as effective until the recordation date, we conclude that the contribution date for an easement on real property in New York is the recording date."

Petitioners argue that Rothman was wrongly decided. They argue that the contribution date of the conservation easement was September 22, 2004, the date on which a duly authorized representative of the Trust executed the conservation deed on behalf of the Trust. They contend that "[t]he recordation requirement in * * * [NYEC Law sec.] 49-0305(4) only makes the easement effective against subsequent purchasers. It has nothing to do with the creation or conveyance of the property interest." We disagree.

**[\*22]** Petitioners rely on N.Y. Real Prop. Law (NYRP Law) secs. 244 and 291 (McKinney 2006).[9] NYRP Law sec. 244 provides that a "grant takes effect, so as to vest the estate or interest intended to be conveyed, only from its delivery". NYRP Law sec. 291 provides that

> [a] conveyance of real property, within the state, * * * <u>may be recorded</u> in the office of the clerk of the county where such real property is situated * * *. <u>Every such conveyance not so recorded is void as against any person who subsequently purchases</u> or acquires by exchange or contracts to purchase or acquire by exchange, the same real property or any portion thereof, * * * in good faith and for a valuable consideration, * * * and whose conveyance, contract or assignment is first duly recorded * * * [Emphasis added.]

Both of these sections provide the general rules in New York with respect to conveyances of real property. Conservation easements, however, are subject to special rules in NYEC Law art. 49 tit. 3. These special rules apply only to conservation easements. <u>See</u> NYEC Law sec. 49-0309 ("This title shall not affect any interests or rights in real property which are not conservation easements, and shall not affect the rights of owners to convey any interests in real property which

---

[9] Petitioners cite a number of cases on brief which discuss N.Y. Real Prop. Law secs. 244 and/or 291 (McKinney 2006), including <u>Manhattan Life Ins. Co. v. Cont'l Ins. Cos.</u>, 308 N.E. 2d 682, 683 (N.Y. 1974), <u>James v. Lewis</u>, 522 N.Y.S. 2d 897, 898 (App. Div. 1987), and <u>Buckley v. Chevron, U.S.A., Inc.</u>, 565 N.Y.S. 2d 419, 421 (Sup. Ct. 1991). These cases all deal with general conveyances of real property and not conservation easements.

**[*23]** they could now create under existing law without reference to the terms of this title.").

One of the special rules in the NYEC Law is that conservation easements <u>must</u> be recorded. <u>See</u> NYEC Law sec. 49-0305(4) ("A conservation easement shall be duly recorded and indexed as such in the office of the recording officer for the county or counties where the land is situate in the manner prescribed by article nine of the real property law."). This rule differs from the general rule in NYRP Law sec. 291, which provides that conveyances of real property <u>may</u> be recorded. Conservation easements are governed by the special rules of the NYEC Law, rather than the general rules of the NYRP Law, where the two conflict. <u>See</u> <u>D. Ginsberg & Sons, Inc. v. Popkin</u>, 285 U.S. 204, 208 (1932) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling.").

NYRP Law sec. 291 provides that if a conveyance of real property is not recorded, then the conveyance is not effective against a subsequent purchaser for value who records first. Petitioners argue that the same result applies to an unrecorded conservation easement. But petitioners are mistaken. The NYEC Law is clear that a conservation easement must be recorded. A conservation easement that is not recorded does not have any legal effect in the State of New York. <u>See</u>

[*24] NYEC Law sec. 49-0305(4) ("An instrument for the purpose of creating, conveying, modifying or terminating a conservation easement shall not be effective unless recorded.").

In these cases, the conservation deed was recorded on January 26, 2005, by the New York City Department of Finance, Office of the City Register.[10] We conclude that the conservation deed was not effective until that date. However, even assuming arguendo that we were to accept petitioners' argument that the conservation deed was legally enforceable by the Trust against petitioners on September 22, 2004, and became effective against subsequent purchasers on January 26, 2005, the conservation easement still would not have satisfied the perpetuity requirements of section 170(h)(2)(C) and (5)(A) in 2004.

Mr. Pretsfelder listed the townhouse for sale on behalf of petitioners on June 16, 2003. He had drafted a setup of the townhouse and was actively marketing the townhouse to potential buyers. However, he did not tell any of

---

[10] Petitioners argue on brief that the Trust mailed the conservation deed to the New York City Department of Finance, Office of the City Register, on December 10, 2004, and that the conservation deed is deemed recorded as of that date. However, petitioners have not presented any credible evidence that the Trust mailed the conservation deed in 2004. The parties stipulated that "[t]he conservation deed was recorded by the City of New York Office of Register on January 26, 2005" and the record contains a copy of the Recording and Endorsement cover page showing a recordation date of January 26, 2005. We find that the recordation date is January 26, 2005.

[*25] them about the conservation easement. If a buyer had purchased the townhouse and had recorded the deed of conveyance before January 26, 2005, that buyer could have taken the townhouse free and clear of the conservation easement. See Panther Mountain Water Park, Inc. v. Cnty. of Essex, 836 N.Y.S. 2d 374, 376 (App. Div. 2007) ("A bona fide purchaser--one who purchases real property in good faith, for valuable consideration, without actual or record notice of another party's adverse interests in the property and is the first to record the deed or conveyance--takes title free and clear of such adverse interests[.]"); Webster v. Ragona, 776 N.Y.S. 2d 347, 351 (App. Div. 2004) ("[A] good faith purchaser for value is not bound by an easement which is not properly recorded prior to a purchase of the encumbered property[.]"). The possibility that this could have occurred was not "so remote as to be negligible." See sec. 1.170A-14(g)(3), Income Tax Regs.

We hold that the requirements of section 170(h)(2)(C) and (5)(A) have not been met for 2004 because neither the use restriction nor the conservation purpose of the conservation easement was protected in perpetuity until January 26, 2005. Accordingly, Dr. Zarlengo and Ms. McMahon-Zarlengo are not entitled to a deduction for the conservation easement for 2004. We do not have jurisdiction to redetermine Ms. Sandin-Zarlengo's Federal income tax liability for 2004. We do,

[*26] however, have jurisdiction to redetermine her tax liabilities for 2005-07, and we may consider her 2004 taxable year as may be necessary for redetermining her tax liability for 2005-07.  See sec. 6214(b); Fitch v. Commissioner, T.C. Memo. 2012-358, at *27.

Because of applicable gross income limitations on charitable contribution deductions, see sec. 170(b)(1)(B), Ms. Sandin-Zarlengo was able to use only $32,038 of the $330,000 deduction that she reported on her 2004 tax return for the conservation easement.  Ms. Sandin-Zarlengo claimed carryover deductions on her 2005-07 tax returns based on the unused portion of the 2004 deduction.  Because she would not have been entitled to the 2004 deduction, it follows that she is not entitled to the carryover deductions for 2005-07.  See, e.g., Mountanos v. Commissioner, T.C. Memo. 2013-138, at *17 (holding that the taxpayer was not entitled to charitable contribution carryover deductions for the donation of a conservation easement because the taxpayer failed to prove the easement had any value); Naylor v. Commissioner, T.C. Memo. 2013-19, at *9-*10 ("Without actual substantiation of the original losses which led to the claimed 2003 capital loss carryovers, we cannot allow petitioner's 2003 capital loss carryover deductions.").

We asked the parties to brief whether any of petitioners might be entitled to a deduction for the conservation easement for any of the other years at issue in the

[*27] event the Court were to agree with respondent that the requirements of the statute have not been met for 2004. The parties agree, as do we, that the Court lacks jurisdiction to determine whether Dr. Zarlengo and Ms. McMahon-Zarlengo are entitled to a deduction for any other year because the only year before the Court with respect to them is 2004. The situation is different with respect to Ms. Sandin-Zarlengo. We have jurisdiction to redetermine her Federal income tax liabilities for 2005-07. Respondent "acknowledges that the [Conservation] Easement could be considered made in perpetuity under * * * [section] 170(h)(2)(C) & (5)(A) in 2005, because the [Conservation] Easement was recorded in that year." Notwithstanding, respondent argues that Ms. Sandin-Zarlengo is not entitled to a deduction for any other year because she failed to properly substantiate the conservation easement. Ms. Sandin-Zarlengo argues that she "complied or substantially complied with all the requirements for the deduction in 2005" and that we should "redetermine her tax liability for 2005, 2006, and 2007 accordingly."

We find that both the use restriction and the conservation purpose of the conservation easement were protected in perpetuity as of January 26, 2005. We further find that Ms. Sandin-Zarlengo has satisfied the other requirements of

**[\*28]** section 170(h) with respect to the conservation easement for 2005.[11] We determine next whether she has met the relevant substantiation requirements.

III. Substantiation Requirements

A. General Rules

A taxpayer is generally allowed a deduction for any charitable contribution of property made during the taxable year only if the contribution is verified under regulations prescribed by the Secretary. Sec. 170(a)(1). The amount allowed as a deduction for a noncash contribution of property is the fair market value of the contributed property measured as of the donation date. See sec. 1.170A-1(c)(1),

---

[11] Respondent argues on brief that the conservation easement did not have a "conservation purpose" within the meaning of sec. 170(h)(4)(A)(iv) because it did not preserve the townhouse in any way that local law did not. We disagree. The townhouse is subject to the good repair standard. The LPC does not actively monitor properties subject to this standard. The LPC instead relies on the local community to report violations. The Trust, on the other hand, actively monitors properties on which it owns a conservation easement through annual inspections. We find this difference to be significant.

Moreover, the LPC and the Trust do not follow the same preservation standards. The LPC has its own set of regulations. These regulations are found in the LPC code and the LPC rules. The Trust follows the standards promulgated by the Secretary of the Interior. The LPC's regulations and the Secretary's standards are similar, but not identical. John Weiss, deputy counsel for the LPC, credibly testified that the LPC changes its rules approximately every two years. We find that the conservation easement provides the townhouse with an additional layer of protection over and above that provided by the LPC's regulations. Accordingly, we find that the conservation easement preserves the townhouse within the meaning of sec. 170(h)(4)(A)(iv).

[*29] Income Tax Regs.  A deduction claimed for a noncash contribution of property valued at more than $5,000 is generally denied unless the taxpayer obtains a qualified appraisal of the donated property and attaches to the return for the taxable year in which the contribution is made such information regarding the property and the appraisal as the Secretary requires.  Sec. 170(f)(11)(A)(i), (C).[12] Section 170(f)(11) and section 1.170A-13(c)(2), Income Tax Regs., collectively require a taxpayer claiming a noncash charitable contribution deduction of more than $5,000 to (1) obtain a qualified appraisal of the contributed property, (2) attach to the return first claiming the deduction a fully completed appraisal summary (i.e., Form 8283), and (3) maintain records containing the information required in section 1.170A-13(b)(2)(ii), Income Tax Regs.

Another relevant statutory provision is the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155, 98 Stat. at 691, through which Congress directed the Secretary to prescribe regulations requiring any individual, closely held corporation, or personal services corporation claiming a charitable contribution deduction for which the claimed value of the contributed property is

---

[12]  The requirements of sec. 170(f)(11) apply to petitioners' donation of the conservation easement to the Trust because that contribution was completed after the effective date of that section; i.e., after June 3, 2004.  See American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 883(b), 118 Stat. at 1632.

**[*30]** more than $5,000 to obtain a qualified appraisal. Congress defined the term

"qualified appraisal" to mean an appraisal prepared by a qualified appraiser that

includes, among other information, (1) a description of the property appraised, (2)

the fair market value of the property on the contribution date and the specific basis

for valuation, (3) a statement that the appraisal was prepared for income tax

purposes, (4) the qualifications of the appraiser, and (5) any additional information

the Secretary may prescribe by regulation. Id. sec. 155(a)(4), 98 Stat. at 692.

Pursuant to his grant of authority under DEFRA, the Secretary promulgated

section 1.170A-13(c), Income Tax Regs. See T.D. 8199, 1988-1 C.B. 99 (stating

in the preamble that amendments to the regulations interpreting section 170 were

promulgated to conform existing regulations to DEFRA sec. 155).

Regulations issued under section 170 generally define a qualified appraisal

as an appraisal document prepared by a qualified appraiser no earlier than 60 days

before the contribution date and no later than the extended due date of the return

first claiming the deduction. Sec. 1.170A-13(c)(3)(i), Income Tax Regs.

Additionally, a qualified appraisal must include the following information:

> (A) A description of the property in sufficient detail for a
person who is not generally familiar with the type of property to
ascertain that the property that was appraised is the property that was
(or will be) contributed;

**[*31]** (B) In the case of tangible property, the physical condition of the property;

(C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, * * *

(E) The name, address, and * * * the identifying number of the qualified appraiser; and, if the qualified appraiser is acting in his or her capacity as * * * an employee of any person (whether an individual, corporation, or partnerships [sic]), * * * the name, address, and taxpayer identification number * * * of * * * the person who employs or engages the qualified appraiser;

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value (within the meaning of §1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less depreciation approach; and

(K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a

- 32 -

[*32] justification for using sampling and an explanation of the sampling procedure employed.

Sec. 1.170A-13(c)(3)(ii), Income Tax Regs.

B.    Substantial Compliance

The provisions of section 1.170A-13(c)(3), Income Tax Regs., are directory,

requiring substantial compliance, rather than mandatory, requiring strict

compliance.  See Bond v. Commissioner, 100 T.C. 32 (1993).  At issue in Bond

was whether the taxpayers were entitled to a charitable contribution deduction for

the contribution of two blimps to a charitable organization.  The Bond parties

agreed upon the value of the contributed property, that a qualified appraiser

completed an appraisal, and that the donee organization was qualified to receive

the contribution.  The Commissioner, however, asserted that the taxpayers were

not entitled to the claimed deduction because they failed to obtain and attach to

their return a separate written appraisal including the reporting information

specified in section 1.170A-13, Income Tax Regs.  In concluding that the

requirements of section 1.170A-13, Income Tax Regs., were directory as opposed

to mandatory, we explained:

> [I]t is apparent that the essence of section 170 is to allow certain
> taxpayers a charitable deduction for contributions made to certain
> organizations.  It is equally apparent that the reporting requirements
> of section 1.170A-13, Income Tax Regs., are helpful to respondent in

**[*33]** the processing and auditing of returns on which charitable deductions are claimed. However, the reporting requirements do not relate to the substance or essence of whether or not a charitable contribution was actually made. We conclude, therefore, that the reporting requirements are directory and not mandatory. [Id. at 41; citations omitted.]

We held that the taxpayers in Bond had substantially complied with the requirements of section 1.170A-13, Income Tax Regs., noting that information missing from their return was promptly furnished to the Commissioner's revenue agent at or near the beginning of the audit.

In Hewitt v. Commissioner, 109 T.C. 258 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998), the taxpayers had claimed a charitable contribution deduction for a donation of shares of stock that were not publicly traded. The taxpayers, however, had not obtained qualified appraisals before filing their returns for the years at issue. The Commissioner disallowed a portion of the deduction because of the lack of a qualified appraisal. The taxpayers countered that they had substantially complied with the appraisal requirements and attempted to rely on Bond.

We rejected the taxpayers' argument because the taxpayers had not provided any of the information required by section 170 and the regulations thereunder. Taken together, Bond and Hewitt "provide a standard by which we can consider

**[*34]** whether petitioners provided sufficient information to permit respondent to evaluate their reported contributions, as intended by Congress." Smith v. Commissioner, T.C. Memo. 2007-368, slip op. at 47, aff'd, 364 Fed. Appx. 317 (9th Cir. 2009).

### C. Application of the Law

Respondent argues that Ms. Sandin-Zarlengo has failed to comply with a number of the aforementioned substantiation requirements. We address each of the disputed requirements in turn.

### 1. Date of the Appraisal Report

Respondent argues that Mr. Haims prepared the appraisal report more than 60 days before the date of the contribution of the conservation easement in violation of section 1.170A-13(c)(3)(i)(A), Income Tax Regs. The appraisal report is dated August 24, 2004, and has an effective date of July 26, 2004 (i.e., the date on which the conservation easement is valued). Petitioners signed the conservation deed on September 10, 2004, and a duly authorized representative of the Trust signed the conservation deed on September 22, 2004. Thus, both petitioners and the Trust assented to the terms of the conservation deed within 60 days of July 26, 2004. However, the conservation deed was not recorded until January 26, 2005. As previously discussed, we conclude that the date of the

**[*35]** contribution is the date of recordation. See supra pp. 20-28. Therefore, the appraisal report was untimely.

However, the timeliness requirement of section 1.170A-13(c)(3)(i)(A), Income Tax Regs., does not relate to the essence of section 170. See Bond v. Commissioner, 100 T.C. at 41; see also Sperapani v. Commissioner, 42 T.C. 308, 331 (1964) ("'Generally those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly and prompt conduct of the business, and by the failure to obey no prejudice will occur to those whose rights are protected by the statute, are not commonly considered mandatory.'" (quoting 2 Sutherland, Statutory Construction, sec. 2802, at 216 (3d ed.))). We have previously found that a taxpayer may substantially comply with the substantiation requirements notwithstanding the taxpayer's premature appraisal. See Consol. Investors Grp. v. Commissioner, T.C. Memo. 2009-290, slip op. at 59 (concluding that the premature nature, by approximately three months, of a partnership's appraisal report was insubstantial).

###### 2. Adequate Description

Respondent argues that the appraisal report fails to describe property that was appraised within the meaning of section 1.170A-13(c)(3)(ii)(A), Income Tax Regs. We disagree. The appraisal report describes the property appraised as a

[*36] "historic preservation easement".  The appraisal report includes a detailed description of the townhouse complete with photographs of its interior, exterior, and surroundings.  Moreover, part 1 of the appraisal summary describes the property appraised as "309 West 80th Street" and as a "Historic Preservation Easement".  We find that Ms. Sandin-Zarlengo has complied or substantially complied with section 1.170A-13(c)(3)(ii)(A), Income Tax Regs.

### 3.    Date of the Contribution

Respondent argues that the appraisal report fails to state the date (or expected date) of the contribution as required by section 1.170A-13(c)(3)(ii)(C), Income Tax Regs.  This is true.  However, on part 4 of the appraisal summary, the Trust acknowledged that it had received the conservation easement on September 22, 2004.  Thus, respondent was put on notice that the date (or expected date) of the contribution was to be September 22, 2004, notwithstanding our holding that the contribution was not actually effective until January 26, 2005.  In Simmons v. Commissioner, T.C. Memo. 2009-208, slip op. at 18, aff'd, 646 F.3d 6 (D.C. Cir. 2011), we found that the taxpayer complied with section 1.170A-13(c)(3)(ii)(C), Income Tax Regs., where the date of the contribution was provided on Forms 8283 attached to the taxpayer's tax return.  We find that Ms. Sandin-Zarlengo has

[*37] complied or substantially complied with section 1.170A-13(c)(3)(ii)(C), Income Tax Regs.

### 4. Terms of Agreement or Understanding

Respondent argues that the appraisal report fails to provide the terms of any agreement or understanding entered into as required by section 1.170A-13(c)(3)(ii)(D), Income Tax Regs. We disagree. Mr. Haims attached a copy of the sample deed to the appraisal report. The sample deed was identical in all material respects to the conservation deed, except for the fact that it had a few blank lines for the donor's personal information (such as the donor's name, address, historic district, etc.). Petitioners' personal information was provided elsewhere in the appraisal report. We find that Ms. Sandin-Zarlengo has complied or substantially complied with section 1.170A-13(c)(3)(ii)(D), Income Tax Regs.

### 5. Appraisal Report Prepared for Income Tax Purposes

Respondent argues that the appraisal report does not contain a statement that it was prepared for income tax purposes as required by section 1.170A-13(c)(3)(ii)(G), Income Tax Regs. The appraisal report states that its intended use "is to assist our client [Ms. Sandin-Zarlengo] in determining the Federal tax benefits resulting from the creation of the subject's [townhouse's] historic preservation easement." We find that this statement complies or

[*38] substantially complies with the requirements of section

1.170A-13(c)(3)(ii)(G), Income Tax Regs.

### 6. Fair Market Value of the Conservation Easement

Respondent argues that the appraisal report fails to appraise the "fair market

value" of the conservation easement as required by section 1.170A-13(c)(3)(ii)(I),

Income Tax Regs. Mr. Haims determined the "market value" of the townhouse to

be $6 million as of July 26, 2004. He then applied an 11% diminution to the

"market value" of the townhouse to arrive at a value of $660,000 for the

conservation easement.

Mr. Haims defines the term "market value" in the appraisal report as:

> The most probable price, as of a specified date, in cash, or in
> terms equivalent to cash, or in other precisely revealed terms, for
> which the specified property rights should sell after reasonable
> exposure in a competitive market under all conditions requisite to a
> fair sale, with the buyer and seller each acting prudently,
> knowledgeably and for self interest, and assuming that neither is
> under undue duress.

Section 1.170A-1(c)(2), Income Tax Regs., defines "fair market value" as "the

price at which the property would change hands between a willing buyer and a

willing seller, neither being under any compulsion to buy or sell and both having

reasonable knowledge of relevant facts." This definition is similar to Mr. Haims'

definition of "market value", though not identical.

[*39] On part 1 of the appraisal summary, Mr. Haims states the conservation easement's appraised "fair market value" to be $660,000, the exact same value as stated in his appraisal report for the conservation easement's "market value". Furthermore, the parties have stipulated that "According tò the Haims Appraisal the facade easement had a fair market value of $660,000 at the time of contribution." By all accounts, it appears that Mr. Haims used the terms "market value" and "fair market value" synonymously. We find that Ms. Sandin-Zarlengo has complied or substantially complied with section 1.170A-13(c)(3)(ii)(I), Income Tax Regs.

### 7. Qualified Appraiser

Respondent argues that Ms. Sandin-Zarlengo has failed to satisfy section 1.170A-13(c)(3)(i)(B), Income Tax Regs. That regulation requires that an appraisal be "prepared, signed, and dated by a qualified appraiser (within the meaning of paragraph (c)(5) of this section)". The parties have stipulated that: (1) petitioners retained Mr. Haims to appraise the conservation easement; (2) the appraisal report was prepared by Mr. Haims; and (3) Mr. Haims is a qualified appraiser. Mr. Haims prepared, signed, and dated the appraisal report.

Section 1.170A-13(c)(5)(iii), Income Tax Regs., provides:

[*40] More than one appraiser may appraise the donated property. If more than one appraiser appraises the property, the donor does not have to use each appraiser's appraisal for purposes of substantiating the charitable contribution deduction pursuant to this paragraph (c). If the donor uses the appraisal of more than one appraiser, or if two or more appraisers contribute to a single appraisal, each appraiser shall comply with the requirements of this paragraph (c), including signing the qualified appraisal and appraisal summary as required by paragraphs (c)(3)(i)(B) and (c)(4)(i)(C) of this section, respectively.

Respondent argues that the appraisal report does not state whether Ms. Hao is a qualified appraiser within the meaning of section 1.170A-13(c)(5), Income Tax Regs., and that she did not testify at trial. Ms. Hao is an employee of Mr. Haims' company. She performed a physical inspection of the townhouse and assisted Mr. Haims in the preparation of the appraisal report. There is no indication in the record that any of the figures in the appraisal report were her own. We do not believe that her assistance has caused Ms. Sandin-Zarlengo to violate section 1.170A-13(c)(3)(i)(B), Income Tax Regs.

D.    Conclusion Regarding Substantiation Requirements

Ms. Sandin-Zarlengo has complied or substantially complied with all of the disputed substantiation requirements under section 1.170A-13(c)(3)(ii), Income Tax Regs. She has not complied or substantially complied with the timeliness requirement under section 1.170A-13(c)(3)(i)(A), Income Tax Regs., in that the appraisal report was premature. However, as previously discussed, this

**[\*41]** requirement does not relate to the essence of section 170.  We conclude that Ms. Sandin-Zarlengo has satisfied the requirements to substantiate the conservation easement.

IV.     Valuation of the Conservation Easement

     A.     General Principles

We now arrive at the question of valuation--how much is the conservation easement actually worth?  The regulations provide that the value of a conservation easement is the fair market value of the conservation easement at the time of the contribution.  See sec. 1.170A-14(h)(3)(i), Income Tax Regs.  If a substantial record of sales of conservation easements comparable to the donated conservation easement exists, then the fair market value of the donated conservation easement is based on the sale prices of the comparable easements.  See id.

However, there is no substantial record of sales of conservation easements similar to the conservation easement that petitioners donated.  In such a case, the regulations provide that the fair market value of a conservation easement, as a general rule, is equal to the difference between the fair market value of the encumbered property before the conservation easement is granted and the fair market value of the encumbered property after the conservation easement is granted.  See id.  This approach is known as the "before and after" approach.  It

**[\*42]** has been used by this Court on numerous occasions. See, e.g., Hilborn v.

Commissioner, 85 T.C. 677, 689 (1985); Gorra v. Commissioner, T.C. Memo.

2013-254, at \*49; Simmons v. Commissioner, T.C. Memo. 2009-208, slip op. at

26.

B.    The Expert Witnesses

The parties each called an expert witness to help us determine the fair

market value of the conservation easement. See Fed. R. Evid. 702; Crimi v.

Commissioner, T.C. Memo. 2013-51, at \*40 ("An expert witness may be allowed

to testify in a proceeding before this Court when his or her scientific, technical, or

other specialized knowledge might help us to understand the evidence or decide a

fact in issue."). We evaluate expert opinions in the light of all the evidence in the

record, and we may accept or reject an expert's testimony, in whole or in part,

according to our independent evaluation of the evidence in the record. See

Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Malachinski v.

Commissioner, 268 F.3d 497 (7th Cir. 2001), aff'g T.C. Memo. 1999-182; Estate

of Davis v. Commissioner, 110 T.C. 530, 538 (1998).

**[*43]** Petitioners offered expert testimony of Eric Haims.[13] Eric Haims is the senior vice president of Jerome Haims Realty, Inc. He is a certified real estate general appraiser in New York. He appraised the conservation easement using the "before and after" approach as of September 22, 2004, and as of January 26, 2005.

Respondent offered expert testimony of Timothy Barnes. Mr. Barnes is a senior managing director at Cushman & Wakefield. He is also a certified real estate general appraiser in New York. He appraised the conservation easement using the "before and after" approach as of September 22, 2004, only.

C. The "Before" Values

1. Eric Haims' "Before" Values

Eric Haims used the "sales comparison approach" to determine the "before" values of the conservation easement as of September 22, 2004, and as of January 26, 2005. The "sales comparison approach" is based on the principle of substitution, the theory being that the value of a property sold in a competitive market is based on the cost of acquiring a comparable substitute property. Under this approach, Eric Haims researched properties in Manhattan that were comparable to the townhouse and that had sold on the market in 2004 or 2005. He

---

[13] Eric Haims is Jerome Haims' son. To avoid confusion, we will refer to Eric Haims by his full name.

[*44] selected three properties on the Upper West Side that, in his view, were comparable to the townhouse. He then adjusted the sale prices of these properties to account for differences between the properties and the townhouse in (1) date of sale, (2) location, (3) frontage, (4) presence of an elevator, (5) condition, (6) presence of a garage, (7) number of baths, (8) gross living area, and (9) number of fireplaces. He arrived at "before" values of $5.5 million and $6 million as of September 22, 2004, and January 26, 2005, respectively.

### 2. Mr. Barnes' "Before" Value

Like Eric Haims, Mr. Barnes used the "sales comparison approach" to determine the "before" value of the conservation easement. He selected five properties on the Upper West Side that, in his view, were comparable to the townhouse.[14] He then adjusted the sale prices of the properties to account for differences between the properties and the townhouse in (1) market conditions, (2) location, (3) size, (4) condition, (5) floors, and (6) frontage. He arrived at a "before" value of the townhouse of $3.6 million as of September 22, 2004. He did not compute a value for the townhouse as of January 26, 2005.

---

[14] These five properties were all different from the properties that Eric Haims had selected for use in his Sales Comparison Approach.

**[*45]**    3.    <u>Analysis of "Before" Values</u>

On brief, each of the parties criticizes the adjustments of the other parties' expert.  Respondent argues that "Eric Haims abused the adjustment process in order to artificially inflate the 'before' value of the Property -- under the percentage 'theory' the higher the 'before' value, the higher the easement's value." Petitioners argue that Mr. Barnes made some excessive adjustments and failed to make other necessary adjustments, the result being that his "before" value was too low.

We find many of the parties' criticisms to be well founded.  Each expert made adjustments designed to support his side's litigating positions.  Experts lose their usefulness and credibility when they merely become advocates for the position argued by a party.  <u>Laureys v. Commissioner</u>, 92 T.C. 101, 129 (1989).[15] Petitioners' expert computed unreasonably high "before" values, while respondent's expert computed an unreasonably low "before" value.  We believe that the true value of the townhouse lies somewhere in between.

---

[15] An expert qualified to testify in a judicial proceeding owes a duty to the Court that transcends the duty to his or her client insofar as the expert must present his or her opinion, as well as the facts, data, and analysis on which he or she relied, neutrally and candidly.  <u>Estate of Halas v. Commissioner</u>, 94 T.C. 570, 577-578 (1990); <u>see also</u> <u>Estate of Mitchell v. Commissioner</u>, T.C. Memo. 2002-98, slip op. at 22-23; <u>Wagner Constr., Inc. v. Commissioner</u>, T.C. Memo. 2001-160, slip op. at 50-51.

**[\*46]** We are not bound by values computed by either side's expert witness. See Silverman v. Commissioner, 538 F.2d 927, 933 (2nd Cir. 1976), aff'g T.C. Memo. 1974-285. We may reach our own determination of value on the basis of our analysis of the evidence in the record. Id.

Mr. Pretsfelder credibly testified that he thought petitioners' $5.5 million asking price for the townhouse was too high relative to other properties on the market, and that the townhouse "would have sold in the four's". He further testified that "four and a half" did not "sound unreasonable". We find Mr. Pretsfelder to be a credible and unbiased witness.[16] He specializes in townhouse sales and was very familiar with petitioners' townhouse. We find that $4.5 million is the best evidence of the "before" value of the townhouse as of January 26, 2005.

D.    The "After" Values

    1.    Eric Haims' "After" Values

Eric Haims conducted an empirical market study based on a "paired sales analysis" of residential properties in New York City to determine the "after" values of the conservation easement. As its name implies, this technique calls for comparing the sale prices of properties that are matched in pairs. In theory, the

---

[16] While Mr. Pretsfelder was petitioners' broker, he was actually called to testify as a witness for respondent.

**[*47]** properties in each pair would be identical except for the fact that one of the properties would be encumbered by an easement. The premise is that when two properties are identical in all respects except that one of the properties is encumbered by an easement, the value of the easement can be measured as the difference between the sale prices of the two properties. In practice, however, it is all but impossible to find identical pairs of unencumbered and easement-encumbered properties. Therefore, similar properties are generally paired, and adjustments are made to the sale price of one of the properties in each pair to account for differences between the properties.

Eric Haims matched 10 pairs of comparable unencumbered and easement-encumbered properties together. He then adjusted one of the properties in each pair for differences in (1) location, (2) gross living area, (3) presence of an elevator, (4) parking, and (5) frontage. He arrived at median and mean diminutions of value of 8.81% and 11.20%, respectively, to the easement-encumbered properties as a result of the additional burdens imposed by the conservation easements on the properties.

Eric Haims selected 11% as the diminution of value to apply to the townhouse as a result of the conservation easement. He arrived at "after" values for the townhouse of $4.9 million and $5.34 million as of September 22, 2004, and

**[*48]** January 26, 2005, respectively. He subtracted the "after" values from the "before" values to arrive at fair market values of $600,000 and $660,000 for the conservation easement as of September 22, 2004, and January 26, 2005, respectively.

## 2. Mr. Barnes' "After" Value

Mr. Barnes did not attempt to compute the "after" value of the townhouse using any methodology.[17] He states in his expert report that the value of the townhouse might in theory be diminished by the grant of the conservation easement as a result of one or more factors. He then lists various factors that might cause the granting of a conservation easement to reduce the value of a property, including its placing a greater burden on the property owner. He concludes, however, that he is "not persuaded that the [conservation] easement places a greater burden on the owner, creates an additional layer of regulation, or

---

[17] In an addendum to his expert report, Mr. Barnes lists six properties in Manhattan that had been sold on the market before being encumbered by an easement and had been resold after being encumbered by an easement. He notes that there was "substantial appreciation in the value of the properties" between the sales and resales. The resales occurred roughly four to eight years after the original sales. The increases in the resale prices are likely due to a number of factors, including appreciation in the real estate market. Mr. Barnes did not attempt to isolate the effect of the easements on the resale prices. We find his "analysis" to be devoid of any value for purposes of valuing the conservation easement.

[*49] will result in additional costs."[18]  We disagree.  We find that the conservation easement did impose additional burdens.  See supra note 11.

Mr. Barnes also states in his expert report that he "inquired among a number of brokers and valuation professionals in the local market whether the presence of a facade easement affected either the marketability of or the ability to finance a townhouse", and that "[t]he uniform response was that the easements had no effect on buyer interest, marketing time, or the ability to secure mortgage capital."  Mr. Barnes does not list the brokers and valuation professionals with whom he purportedly consulted nor the questions that he purportedly asked them.  Mr. Barnes concludes that the "after" value of the townhouse was $3.6 million as of

---

[18]  We do not find it particularly significant that the buyers did not reduce their offer on the townhouse after they became aware of the conservation easement.  Mr. Pretsfelder and the buyers' broker had carried on extensive negotiations up until that point.  They had reached an agreement on a purchase price of $4,650,500 for the townhouse, which was more than $800,000 below petitioners' $5.5 million asking price.  Mr. Astrachan (one of the buyers) credibly testified that he wanted to honor this agreement.  Returning to the negotiating table could very well have jeopardized the agreement, and it is certainly plausible that the buyers did not want to risk the prospects of striking a new agreement.  Furthermore, the conservation easement resulted in additional compliance costs to the buyers, who had to obtain the permission of the Trust before carrying out their pre-purchase plans to modify the townhouse.  The conservation easement did not significantly affect these plans, but it might have a larger impact on any future plans the buyers may have and/or plans of any future purchasers of the townhouse.

[*50] September 22, 2004, the same as his "before" value, and that the conservation easement thus had no value.

### 3. Analysis of "After" Values

Mr. Barnes' conclusory analysis demonstrates his preconceived notion that conservation easements have no value. We reject his analysis as unsupported and unreliable.[19] Ordinarily, any encumbrance on real property, however slight, would tend to have some negative effect on a property's fair market value. Gorra v. Commissioner, at *57; Evans v. Commissioner, T.C. Memo. 2010-207, slip op. at 15. Moreover, Mr. Pretsfelder credibly testified that if two properties are identical in all respects, except for the fact that one of the two properties is burdened by a conservation easement, the property without the easement will have a greater value.

Eric Haims' paired sales analysis, while conceptually sound, is marred by flaws in its execution. Eric Haims did not adjust the values of the properties in his analysis for several important characteristics, including date of sale and condition. He admitted at trial that "if one of the properties was in slightly better or worse

---

[19] While in Scheidelman v. Commissioner, T.C. Memo. 2013-18, at *17-*18, aff'd, ___ F.3d ___ (2d Cir. June 18, 2014), we found Mr. Barnes' judgments to be more reliable than those of the taxpayer's expert, we find Mr. Barnes' expert report to be broad and conclusory in these cases and accord it little value. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

**[*51]** condition, the percentage [diminution] may be a little bit different." The explanation he gave as to why he did not adjust the values of the properties for differences in condition is that his "research and analysis didn't produce enough information to make condition adjustments to the pairs."

Furthermore, many of Eric Haims' adjustments seem to be rather arbitrary. When questioned by respondent's counsel as to why he adjusted the value of one particular property in his analysis by $700 per square foot when the property (including the land on which it was situated) sold for $638 per square foot, his response was that his adjustment "doesn't seem to correlate well." We do not adopt the "after" values of Eric Haims either.

We find, on the basis of our analysis of the evidence in the record, that 3.5% is a reasonable diminution to the value of the townhouse as a result of the additional burdens imposed by the conservation easement. See Scheidelman v. Commissioner, ___ F.3d ___, ___ (2d Cir. June 18, 2014) ("'Valuation is . . . necessarily an approximation[,]' and '[i]t is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence.'" (quoting Silverman v. Commissioner, 538 F.2d at 933)), aff'g T.C. Memo. 2013-18; see also Gorra v. Commissioner, at *61 (finding 2% to be a reasonable diminution in

[*52] value); <u>Simmons v. Commissioner</u>, slip op. at 24-25 (finding 5% to be a reasonable diminution in value). Applying a 3.5% diminution to the townhouse's $4.5 million "before" value, we find that the fair market value of the conservation easement is $157,500 as of January 26, 2005. Accordingly, Ms. Sandin-Zarlengo is entitled to a deduction of $78,750 for 2005 for her contribution of her 50% interest in the conservation easement. We leave it to the parties to compute under Rule 155 the amount of this deduction that Ms. Sandin-Zarlengo may use for 2005 and the excess, if any, that she may carry forward to 2006 and 2007.

V.    <u>Penalties</u>

A.    <u>Introduction</u>

Section 6662(a) and (b)(1), (2), and (3) imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is attributable to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. The penalty is 20% of the portion of the underpayment of tax to which the section applies. Sec. 6662(a). In the case of a gross valuation misstatement, 20% is increased to 40%. Sec. 6662(h)(1). Only one accuracy-related penalty may be applied with respect to any given portion of an

[*53] underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b).  Sec. 1.6662-2(c), Income Tax Regs.

Respondent argues that petitioners are liable for a 40% gross valuation misstatement penalty or, in the alternative, a 20% penalty for negligence, a substantial understatement of income tax, or a substantial valuation misstatement. Respondent bears the burden of production on the applicability of the accuracy-related penalty in that he must come forward with sufficient evidence indicating that it is proper to impose the penalty.  See sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. at 446.

### B.    Valuation Misstatement Penalty

#### 1.    In General

We consider first the valuation misstatement penalty.  Before the enactment of the Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, 120 Stat. 780, a substantial valuation misstatement existed if the value of any property reported on a tax return was "200 percent or more of the amount determined to be the correct amount of such valuation".  Sec. 6662(e)(1)(A).  If the valuation misstatement was 400% or more of the correct amount, a gross valuation misstatement existed and the 20% penalty increased to 40%.  See sec. 6662(e)(1)(A), (h)(1), (2)(A)(i).  Taxpayers could avoid these penalties under

[*54] certain circumstances if they made a valuation misstatement in good faith and with reasonable cause.  See sec. 6664(c).

The PPA lowered the threshold from 200% to 150% for a substantial valuation misstatement and from 400% to 200% for a gross valuation misstatement.  The PPA also eliminated the reasonable cause exception for gross valuation misstatements of charitable deduction property.  See sec. 6664(c)(2).[20] These PPA changes apply to "returns filed after July 25, 2006."[21]  PPA sec. 1219(e)(3), 120 Stat. at 1086.

2.      Pre-PPA Returns

Dr. Zarlengo's 2004 joint return and Ms. Sandin-Zarlengo's 2005 return were filed before July 25, 2006.  Therefore, the PPA does not apply to those returns.  We need not decide whether respondent has met his burden of production as to the substantial or gross valuation misstatement penalties (or any of the other accuracy-related penalties) for 2004 and 2005 because we find that Dr. Zarlengo

---

[20]  This provision was moved to sec. 6664(c)(3) in the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, sec. 1409(c), 124 Stat. at 1069.

[21]  For charitable contributions of property other than facade easements, the changes are effective for returns filed after August 17, 2006.

[*55] and Ms. Sandin-Zarlengo meet the reasonable cause and good faith exception for those years.

Section 6664(c)(1) provides an exception to the imposition of a section 6662 accuracy-related penalty with respect to any portion of an underpayment if a taxpayer establishes that there was reasonable cause for such portion and the taxpayer acted in good faith with respect to such portion. In the case of an underpayment attributable to a substantial or gross valuation misstatement with respect to charitable deduction property, the taxpayer must also establish that the claimed value of the property was based on a qualified appraisal made by a qualified appraiser and the taxpayer made a good faith investigation of the value of the contributed property. Sec. 6664(c)(2); see also sec. 1.6664-4(h), Income Tax Regs. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance upon the advice of a tax professional may establish reasonable cause and good faith for the purpose of avoiding liability for the section 6662(a) penalty. See United States v. Boyle, 469 U.S. 241, 250 (1985). Whether reasonable cause exists when a taxpayer has relied on a tax professional to prepare a return must be determined on the basis of all of the facts and circumstances. See

**[\*56]** <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 98 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002). The taxpayer claiming reliance on a tax professional must prove by a preponderance of evidence that he or she satisfies each prong of the following test: "(1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." <u>Id.</u> at 99.

Petitioners are not financially sophisticated taxpayers. Neither Dr. Zarlengo nor Ms. Sandin-Zarlengo has a background in tax, finance, or accounting. When Ms. Sandin-Zarlengo brought the idea of donating a conservation easement on the townhouse to Dr. Zarlengo's attention, he consulted with Mr. Cirillo, his longtime accountant, about its legitimacy. Mr. Cirllio, a licensed C.P.A. in New York, had approximately 20 years of experience in accounting at the time. He was initially unfamiliar with conservation easements, but he read an article on the subject in the Journal of Accountancy and researched the relevant substantiation requirements before getting back to Dr. Zarlengo. We find that Mr. Cirillo was a competent accountant with sufficient expertise to justify reliance.

Mr. Cirillo explained to Dr. Zarlengo that the deduction was, in fact, legitimate and that petitioners would need to obtain an appraisal and Forms 8283

[*57] to attach to their tax returns. Mr. Cirillo later prepared Dr. Zarlengo's joint tax return for 2004 and Ms. Sandin-Zarlengo's tax return for 2005. Dr. Zarlengo provided him with all of the necessary information relevant to the charitable contribution deductions at issue, including the appraisal report, the appraisal summary, and the conservation deed. Nothing in these documents gave Mr. Cirillo cause for concern as to the accuracy of the appraised value of the conservation easement. We find that petitioners relied on Mr. Cirillo's advice.

We further find that petitioners acted in good faith. The term "good faith" appears in both section 6664(c)(1) and (2)(B). Although the term has no precise definition, it means, among other things, "honesty in belief". Black's Law Dictionary 762 (9th ed. 2009). Petitioners honestly believed that the conservation easement was a completed gift in 2004. On December 10, 2004, they received a letter from the Trust stating that the enclosed appraisal summary was "to be included in your income tax submission for the year 2004." Mr. Cirillo also informed Dr. Zarlengo that he could claim part of the deduction for the conservation easement in 2004 and carry the excess forward.

The amount of the deduction that Dr. Zarlengo and Ms. Sandin-Zarlengo each claimed on their 2004 returns was exactly half of Mr. Haims' appraised value, representing their 50% interests in the conservation easement. The parties

**[\*58]** have stipulated that Mr. Haims is a qualified appraiser, and we have already found that his appraisal report was a qualified appraisal. See supra pp. 28-41. Petitioners made a good faith investigation into the value of the conservation easement by obtaining Mr. Haims' appraisal and Mr. Cirillo's advice.

We find that Dr. Zarlengo and Ms. Sandin-Zarlengo have met the reasonable cause and good faith defense for 2004 and 2005, respectively. Accordingly, they are not liable for accuracy-related penalties with respect to the conservation easement for those years.

### 3. Post-PPA Returns

Ms. Sandin-Zarlengo's 2006 and 2007 returns were filed after July 25, 2006. Therefore, the reasonable cause and good faith rules, as amended by the PPA, apply to those returns. In Chandler v. Commissioner, 142 T.C. ___, ___ (slip op. at 24-26) (May 14, 2014), the taxpayers argued that applying the amended reasonable cause and good faith rules to their 2006 tax return (which was filed after July 25, 2006) would amount to a retroactive application of the PPA because a portion of the underpayment appearing on their 2006 return resulted from the carryover of a charitable contribution deduction which originated on their 2004 return. Id. We rejected their argument and held that the "plain language" of

**[\*59]** the PPA makes the amended reasonable cause and good faith rules "applicable for all returns filed after July 25, 2006." Id. at ___ (slip op. at 25).

In Chandler we had no need to consider whether the pre-PPA thresholds or the post-PPA thresholds applied to the taxpayers' 2006 return because the taxpayers had failed to prove that the conservation easement they donated had any value, and thus under both thresholds the taxpayers' valuation misstatement would have been a gross valuation misstatement. Id. at ___ (slip op. at 24). Likewise, in these cases we need not decide that question as to Ms. Sandin-Zarlengo's 2006 and 2007 returns because respondent has met his burden of production as to the gross valuation misstatement penalties with respect to Ms. Sandin-Zarlengo for 2006 and 2007 regardless of whether the 400% or 200% threshold applies.[22] Ms.

---

[22] Under sec. 1.6662-5(c)(1), Income Tax Regs., the penalty for a substantial or gross valuation misstatement applies to any portion of an underpayment for a year to which a deduction is carried that is attributable to a substantial or gross valuation misstatement for the year in which the carryback or carryover of the deduction arises. Ms. Sandin-Zarlengo first claimed a deduction for the conservation easement on her 2004 return based on a $660,000 valuation. We found that the actual value of the conservation easement was $157,500 as of January 26, 2005. See supra p. 52. Because the conservation easement was not yet effective under New York law in 2004 and because the housing market in New York City was trending upward at the time, it is clear that the conservation easement did not reduce the value of the townhouse by more than $157,500 in 2004. Thus, the valuation misstatement on Ms. Sandin-Zarlengo's 2004 return meets or exceeds the 400% threshold irrespective of whether the conservation easement was worth zero, $157,500, or some amount in between ($660,000 /

(continued...)

**[\*60]** Sandin-Zarlengo may not raise a reasonable cause and good faith defense for 2006 or 2007 because the PPA makes the gross valuation misstatement penalty a strict liability penalty with respect to charitable deduction property.  See sec. 6664(c)(1) and (2).

## VI.    Conclusion

Dr. Zarlengo is not entitled to a charitable contribution deduction for the conservation easement for 2004.  Ms. Sandin-Zarlengo is not entitled to the carryover deductions for 2005-07 that she claimed with respect to the conservation easement.  She is, however, entitled to a deduction of $78,750 for 2005, and she may carry forward any unused portion.  Dr. Zarlengo is not liable for a penalty for 2004, and Ms. Sandin-Zarlengo is not liable for a penalty for 2005.  Ms. Sandin-Zarlengo is liable for 40% gross valuation misstatement penalties for 2006 and 2007 with respect to any underpayments for those years which are attributable to her misvaluation of the conservation easement, provided that the applicable dollar limitation set forth in section 6662(e)(2) is satisfied.

---

[22](...continued)
$157,500 = 419%).  See also sec. 1.6662-5(g), Income Tax Regs. ("The value or adjusted basis claimed on a return of any property with a correct value or adjusted basis of zero is considered to be 400 percent or more of the correct amount.").

**[*61]** We have considered all the arguments of the parties, and, to the extent we have not addressed them, we find them to be irrelevant, moot or meritless.

To reflect the foregoing,

Decisions will be entered

under Rule 155.