FRANK NICOLADIS AND PAGONA NICOLADIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nicoladis v. Commissioner
Docket No. 42696-85.
United States Tax Court
T.C. Memo 1988-163; 1988 Tax Ct. Memo LEXIS 187; 55 T.C.M. (CCH) 624; T.C.M. (RIA) 88163; April 20, 1988. *187 Held: Value of facade donation decided. John J. Weiler, for the petitioners. Linda K. West, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: On October 3, 1985, respondent issued a statutory notice of deficiency to petitioners for the taxable year ended December 31, 1981, having determined a deficiency in the amount of $ 59,512.59. The sole issue for decision is the fair market value of a facade servitude donated to the Preservation Alliance of New Orleans. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners, Frank and Pagona Nicoladis, resided in Metairie, Louisiana, at the time of the filing of the petition herein. During the year in issue Mr. Nicoladis was a limited partner in E.G.-One, Ltd., a Louisiana limited partnership. E.G.-One, Ltd. owned a 40-percent interest in One Magazine Square, a Louisiana ordinary partnership. One Magazine Square donated a perpetual real right (servitude) in and to the exterior surfaces, including facades and roof, of the building located at 3000 Magazine Street, New Orleans, Louisiana (the Property), to the Preservation Alliance *188 of New Orleans, doing business as the Preservation Resource Center (PRC). (The donation will hereinafter be referred to as the "facade donation.") [1] The purpose of PRC is to maintain and keep the architectural integrity of the buildings in the New Orleans area. Once a facade servitude with respect to a building has been granted, any changes to or demolition of the building must be approved by the organization. [2]
In the statutory notice issued to petitioners, respondent reduced petitioners' distributive share of the deduction attributable to the facade donation. Respondent determined that the value of the facade donation was $ 86,000 [3] ratherr than $ 350,000 as was claimed by the partnership. Description of the Property
Magazine Street is a major traffic artery from the downtown Central Business District of New Orleans to the uptown Audubon Park area. The *189 3000 block is located in an area designated "Uptown," and, in 1981, according to the Comprehensive Zoning Ordinance of the City of New Orleans, the Property was zoned "B-2" or "Neighborhood Business District." This classification allowed for a variety of medium density retail and service commercial land uses. The Property is irregular in shape. It takes up the entire Magazine Street frontage between Seventh and Eighth Streets, and is composed of two adjoining rectangular lots and an unimproved "key" lot located to the center and rear of the rectangular lots. An office building is located on the parcel on the corner of Magazine and Seventh Streets, and the adjoining parcel, on the corner of Magazine and Eighth Streets, is vacant and is used as a parking lot. A portion of the Property on which the building lies is also used for parking. The key lot, located behind the building, is vacant. At the time of the donation, the zoning requirements required one parking space for every 400 square feet of office space. Originally constructed in 1887-1888 by the Protestant Orphanage Home, the building was used as an Orphan Asylum until 1972. In the mid-1970's, it was totally renovated *190 as an office building, but the exterior facade was kept in its original form. The building is 2 1/2 stories, and is constructed of brick and masonry. The Property at 3000 Magazine Street was sold to Thomas Farnsworth and Pierre Villere in 1978 for $ 823,500. In 1979 the building was designated an Historic Landmark by the Historic District/Landmark Commission (HDLC). The improvements were considered an excellent example of the Italian Romanesque style typical of large institutional structures employed in the late 19th century. When the HDLC designates property an historic landmark, it does so to preserve the property from destruction and deterioration (demolition by neglect). Changes or additions to property so designated are possible, but must be in keeping with the architectural style and condition of the property and are subject to review by and approval of the HDLC. If a proposal is deemed unacceptable, the commission may recommend changes that would make the proposal acceptable, and will work with an applicant to arrive at an acceptable design. If the HDLC continues to reject the proposal, the applicant can appeal the commission's decision to the city council. If the *191 proposal continues to be rejected, the applicant can then appeal through the courts. Pierre and Miriam Villere later submitted a facade servitude donation application to PRC for the Property sometime after the historic designation. Subsequently the Villeres transferred the Property to One Magazine Square in exchange for 50-percent interests in thhe partnership, and, on the same day of the transfer, December 22, 1981, the Villeres sold a 40-percent interest in One Magazine Square to E.G.-One, Ltd. The facade donation was accepted and was completed December 28, 1981.
Valuation of the Facade Donation
1. Initial Appraisal In July 1981, prior to the facade donation, a "fair market valuation appraisal," for purposes of determining the value of the donation, was performed by W. J. Tessier, Inc., Realtors (the Tessier appraisers). In valuing the facade donation, the appraisers valued the Property as if it were not subject to the donation and then valued the facade servitude as it related to the Property. At that time there was little information available regarding the valuation of facade servitudes. The prevailing opinion was that such grants affected the value of the property, *192 but appraisers were uncertain as to what extent. The Tessier appraisers determined the value of the entire Property without the facade servitude using the cost, market, and income approaches. After weighing the advantages and disadvantages of those approaches, and comparing the results from each, the appraisers arrived at an estimated value. The following excerpt from the Tessier report describes these methods and the problems associated with each: Due to the uniqueness of the subject property that being generally an office building located primarily in a retail and residential area the Market Approach was difficult to ascertain without going to other areas of the city and to adjust office building type sales to subject. Therefore the appraisers heavily relied upon the Cost and Income Approaches to Value. The cost Approach is defined as a method in which the value of a property is derived by estimating the replacement or reproduction cost of the improvements; deducting therefrom the estimated depreciation; and then adding the market value of the land. This approach is based upon the assumption that the reproduction cost new normally sets the upper limit of building value *193 provided that the improvement represents the highest and best use of the land. [4]
The Income Approach is identified as the appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income. The capital amount, called the capitalized value, is, in effect, the sum of the anticipated annual rents less the loss of interest until the time of collection. [5]
Two methods were used to determine the value of the facade donation, one based on the percentage of entire *194 improvements attributable to the facade donation, and the other based on possible loss of use of the Property as a result of the donation. Consideration was given to the fact that the facade covers all of the roof and all exterior surfaces of the building, as well as the structural foundation as it relates to the facade. The appraisers determined that the terms and restrictions of the facade donation effectively constituted a relinquishment of one of the primary rights of property ownership, that of control. 2. Supplemental Appraisals In anticipation of this litigation, petitioners retained the Tessier appraisers again to value the donation in December 1986. Two significant changes in the appraisal were requested. First, the Tessier appraisers were to exclude from market value consideration of that portion of the Property forming the corner of Eighth and Magazine Streets, measuring 105 feet by 105.5 feet, and were to value the effect of the facade donation only with respect to the building and the rectangular parcel of real property on which it lies, and the key lot behind the building. Second, the appraisers were to base their report on the guidelines set forth in a recent *195 decision by the Tax Court involving a facade donation. [6]
With these instructions, the Tessier appraisers provided a second appraisal report December 18, 1986. The stated purpose of the report was to estimate the market value of the Property "before" and "after" the facade donation in accordance with the method used in the Tax Court case. The Tessier appraisers arrived at a "before" value after again comparing estimates using the cost, market data and income methods of valuation. The "after" value was arrived at by applying an overall diminution percentage to the before value and then subtracting an additional amount attributable to loss of potential development. Petitioners also retained Richard F. Brewster to determine separately, the effect of the facade donation upon the market value of the remaining portion of the Magazine Street lot. At the time of his appraisal and at the time of the donation, the lot was asphalt paved and provided a portion of the off-street parking for the office building. Mr. Brewster determined the value of the lot at its highest and best use before and after the donation. *196 He based his "before" value of the site upon a review of land sales from his files. His research failed to reveal any sales criteria for direct valuation of this portion of the Property after the donation, however, so he made a subjective analysis to determine the "after" value. 3. Respondent's Expert Respondent retained Max J. Derbes, Jr.[7] to value the facade donation. Mr. Derbes also relied on the before and after approach to determine the effect of the facade donation on the value of the Property. He relied on the cost, market and income methods to determine the value of the Property before the donation, and then, after examining the terms of the facade donation, and in accordance with the Hilborn decision, he arrived at a percentage reflecting diminution in value. He applied this percentage to the before value, and because of the characteristics of this particular Property, subtracted an additional amount for projected loss of development. [8] The difference between the before and after values, or diminution in value plus loss of development, equaled his estimation of the value of the facade donation. *197 OPINION The only issue to be decided in this case is the fair market value of the facade donation on December 28, 1981. When faced with this issue before we have acknowledged, with approval, that the "before and after approach" is the most feasible method of valuing such a donation. Hilborn v. Commissioner,85 T.C. 677 (1985); see also Symington v. Commissioner,87 T.C. 892 (1986); Stanley Works and Subsidiaries v. Commissioner,87 T.C. 389 (1986). [9] Using this method we can determine whether and to what extent the donation changes the value of the Property. As its name implies, the before and after *198 method accomplishes this objective by subtracting the value of the property immediately after the imposition of the easement from the value of the property immediately before the imposition of the easement to estimate the value of the easement. "Before" value (before value) is arrived at by first determining the highest and best use of the property in its current condition unrestricted by the easement. At this stage, the suitability of the property's current use under existing zoning and market conditions and realistic alternative uses are examined. Any suggested use higher than current use requires both "closeness in time" and "reasonable probability." Next, to the extent possible, the three commonly recognized methods of valuing property (capitalized net operating income, replacement cost, and comparable sales) are used, but are modified to take into account any peculiarities of the property which impact on the relative weight to be afforded each respective method. "After" value (after value) is arrived at by first determining the highest and best use of the property as encumbered by *199 the easement. At this stage the easement's terms and covenants are examined, individually and collectively, and compared to existing zoning regulations and other controls (such as local historic preservation ordinances) to estimate whether, and the extent to which, the easement will affect current and alternate future uses of the property. Next, the above-mentioned three approaches to valuing property are again utilized to estimate the value of the property as encumbered by the easement. [Hilborn v. Commissioner, supra at 689-690.] We note initially that all of the experts expressed reservations about the precision with which they could predict the effect of the facade donation on the value of the Property. [10] All agreed that the grant of a facade servitude is the relinquishment of part of the "bundle of rights" held by a property owner. However, according to the experts, there have been relatively few sales of property encumbered with facade servitudes of this type, and because each piece of property differs with respect to current use, prospective use, neighborhood *200 characteristics, zoning restrictions, etc., the relative effect of the restrictions on the subsequent sale value has been difficult to ascertain. This apparent dearth of comparable data has caused many appraisers to shy away from expressing an opinion as to the effect, if any, of a facade donation on the value of property. [11]
*201 Even with their reservations, the experts were in relative agreement with respect to the values they attributed to the Property before the donation and with respect to the general percentage of diminution to be applied to that value to reflect the effect of the facade donation. [12] Their primary disagreement is with respect to the effect of the historic landmark designation and the facade donation on potential development of the Property and how that relates to the value of the Property before and after the donation. Petitioners contend that the historic landmark designation had relatively little effect on future development of the Property, but that the facade donation effectively eliminated potential development of the land used for parking on Magazine Street. Petitioners' expert concluded that after the donation, the highest and best use of that portion of the Property was as a parking lot only, and therefore a substantial part of the value of the facade donation was attributed to loss of development of the parking lot portion. *202 At trial respondent's expert claimed that the facade donation did not restrict future development of the Property any more than it was already restricted by the historic landmark designation. In his opinion the public would have objected to a division and development of the Magazine Street parking lot even before the facade donation because of the building's historic landmark designation. Any development of the Property was therefore limited to the key lot behind the building both before and after the donation. [13]
After considering all of the experts' reports and testimony, as well as testimony of representatives from the HDLC and the PRC, we are not persuaded that the existing historic landmark designation impacted prospective development of the Property to the extent claimed by respondent's expert, or that the facade donation impacted future *203 development of the parking area on Magazine Street to the extent claimed by petitioners' expert. We have therefore used our best judgment to arrive at a value for the donation that is supported by the entire record, and have relied upon portions of the expert testimony and reports only. While we are inclined generally to accept the "more persuasive expert valuation," as among experts, ( Buffalo Tool & Die Manufacturing Co., Inc. v. Commissioner,74 T.C. 441, 452 (1980)), we are not required to accept such valuation in its entirety. Symington v. Commissioner,87 T.C. 892, 902 (1986); Parker v. Commissioner,86 T.C. 547, 562 (1986). "We can find one such report more persuasive on one ultimate element of valuation and another more persuasive on another ultimate element." Parker v. Commissioner, supra.
Before Value
We find that the value of the Property before the donation was $ 1,187,000. This figure reflects the value of the land and improvements as determined in the second Tessier appraisal ($ 1,112,000), plus *204 a value of $ 75,000 for the remaining portion of the land that was used as a parking lot. We have relied upon the Tessier appraisers' report because we are persuaded that they followed approved valuation guidelines and did not attribute inappropriate significance to the preexisting historic landmark designation. [14] The $ 75,000 figure represents the revised value Mr. Brewster arrived at during trial for the portion of land on Magazine and Eighth Streets. His original value, based on comparable sales, was $ 105,500, or $ 10.00 per square foot, but he did not consider the fact that a portion of the Property would be required for parking to meet the zoning requirements of the adjoining building both before and after the facade donation, regardless of whether the remaining portion of the lot could potentially be developed. Upon taking these facts into consideration, he determined that the highest and best use for a portion of the Property was as a parking lot rather than developed as he originally envisioned and reduced his "before" value accordingly. We recognize that Mr. Brewster did not attempt to value the property using the cost or income approaches, however, we have relied on *205 his value nonetheless because it was very close to that reached by the Tessier appraisers ($ 10.50 per square foot), indicating that his comparables method was reliable. Furthermore, he appropriately adjusted his value downward to reflect the requirement for parking. Although his adjustment was a rough calculation at trial, on the record before us we have no indication that his estimate is unjustified and would likely arrive at the same result ourselves. Mr. Derbes did not break the land into separate parcels, but instead valued all of the land and the improvements thereon. While he considered the amount of parking necessary for the existing improvements and calculated the potential for additional development taking into account additional needs for parking, we are not persuaded that his results accurately portray the development possibilities and the effect parking requirements have on the value of the Property. Not only did he attribute a greater significance to the historic landmark designation *206 than did the other experts, [15] but his land values bear no relation to the potential for development of the land. He valued the two rectangular portions of land at $ 12 per square foot, even though he claimed that it was unlikely that the vacant half of the Property could be developed, and he valued the key lot at $ 6 per square foot, even though he claimed that any potential addition to the office building would probably be added on that lot. Because of the problems associated with this portion of Mr. Derbes' report, we have not relied upon it to determine the "before" value of the Property. *207 After Value
Both the Tessier appraisers and Mr. Derbes attributed to the relinquishment of property rights associated with the facade donation a general 10-percent reduction in value. For lack of evidence to the contrary, we accept this figure. We will not impose our judgment on the issue without sufficient reason to doubt the experts and evidence upon which to base our opinion. In this case the experts have candidly expressed their reservations with respect to their estimations, but their doubt is not necessarily a reason for us to disregard their opinion. Any judgment of our own would be tainted with the same concerns. We note, however, that by this decision we do not mean to imply that a general "10-percent rule" has been established with respect to facade donations. There was a fair amount of discussion by the parties at trial about whether the Court had established a "10-percent rule" in Hilborn. We did not there and do not here. Hilborn establishes as acceptable the before and after method of valuation, and while under the circumstances of that case a 10-percent figure was relied upon, valuation itself is still a question of facts and circumstances. Under *208 the facts and circumstances of this case we find the value of the Property decreased 10 percent due to the encumberance of the facade servitude. In addition to the 10-percent general diminution, we are convinced that the potential to develop the Property has been affected at least to the extent that any change or addition must be approved by PRC above and beyond the approval of the HDLC. We are not persuaded by either party's argument, however, with respect to the amount we should attribute to the effect. Although petitioners claim that the portion of the Property on Magazine and Eighth had no use other than that as a parking lot after the donation, this contention is not supported by the record. There was testimony by a representative of PRC that it was possible that an addition might be approved on that portion of the Property, depending upon the proposal. However, even after this testimony was presented, petitioners did not offer a revised value that would take into account at least some potential for development. [16] Were it not for the fact that respondent's expert attributed $ 50,000 to loss of development, we would be inclined, based on the record, to deny any amount for *209 lack of proof of the same. However, we consider respondent's position to be a concession that at least $ 50,000 should be attributable to the potential loss of development. Therefore we find that the value of the Property decreased in that amount. Based on the foregoing, we find the value of the Property "after" the donation to be $ 1,018,300. The difference between the before and after values, or $ 168,700, is the value we attribute to the facade donation. Decision will be entered under Rule 155.
APPENDIX A (1) Owner agrees to preserve and maintain those portions of the exteriors of the buildings, and to keep them in at least the same state of repair in which they are at the time of this donation. * * * (2) Owner may alter the appearance or composition of those exteriors of buildings donated hereby, including the construction of appurtenant structures, only after having submitted written plans therefor to donee and having obtained donee's written approval. (3) Should demolition occur, or should alterations be undertaken without Donee's written approval and should owner fail to commence corrective work to correct said alterations *210 or repair said demolition within sixty (60) days from receipt of written notice to do so from Donee, and should said work not be complted within a reasonable time thereafter, Donee may compel corrective work at Owner's expense. (4) For the purpose of maintaining the said exteriors in the condition in which they were at the time of this donation, donee may require owner, at owner's expense, to provide repairs and maintenance to the exteriors and roof [unable to read from exhibit] said repairs and maintenance are not commenced within sixty (60) days from a written request delivered by Donee to Owner, or if same are not completed within a reasonable time thereafter, Donee may cause same to be done at Owner's expense; and/or Donee may proceed by summary process against Owner, in a court of competent jurisdiction, to compel said repairs and maintenance. (5) Donee shall have the right to inspect those portions of the buildings donated hereby upon forty-eight (48) hours prior notice. (6) Owner retains all other rights of ownership; including use of the exteriors and roof, that do not conflict with the exercise of Donee's rights hereunder. (7) At least once every five (5) years, *211 owner shall provide to Donee evidence of condition of those portions of the buildings donated hereby, and any structural portions of the buildings incident thereto, from sources acceptable to Donee. * * * (8) Owner agrees to maintain adequate insurance coverage for replacement of the exterior(s) of the building(s) herein donated in an amount equal to their replacement cost; and to maintain adequate insurance to cover damages to persons and property as a result of the condition of the premises, in amounts satisfactory to donee. The policies of insurance obtained pursuant hereto shall name donee as a co-insured as its interest appears herein. In order to ascertain and compel compliance with this section, donee may at any time require owner to show evidence of said insurance; and upon owner's default donee may purchase said insurance at owner's expense and lien the property for the cost of the premiums. * * * Footnotes
1. The material terms and conditions of the donation are set forth in Appendix A. ↩
2. No proposals for change or demolition of the building at 3000 Magazine Street have been submitted to the PRC. ↩
3. This value was apparently based on respondent's engineering and valuation report dated February 7, 1984.↩
4. The valuation report also provides: In arriving at the valuation of the Cost Approach the appraisers relied upon obtaining market data land sales which were adjusted to subject property to determine its land value. The cost per square foot of building improvements were given after consultation with builders, developers, contractors etc. ↩
5. The Tessier appraisers projected the fair economic rent after comparing office buildings of a similar nature and adjusting the rate for location, size, and services offered. A capitalization rate was then applied to the net operating income, (anticipated rental income less operating expenses). ↩
6. Hilborn v. Commissioner,85 T.C. 677↩ (1985). 7. The valuation report was prepared by Max J. Derbes, Jr. and Michael W. Truax, but only Mr. Derbes testified at trial. ↩
8. Mr. Derbes first determined the potential for additional development of the Property, taking into consideration the requirement for off-street parking. In doing so he estimated that either the key lot or a portion of the parking lot on Magazine Street could be developed into additional office/retail space with sufficient property remaining for off-street parking. He then attributed to the value of the facade donation the potential loss of these development possibilities. ↩
9. This method has been approved by the Internal Revenue Service and endorsed by Congress in connection with the adoption of the Tax Treatment Extension Act of 1980. See Rev. Rul. 73-339, 1973-2 C.B. 68, as clarified by Rev. Rul. 76-376, 1976-2 C.B. 53; S. Rept. 96-1007 (1980), 1980-2 C.B. 606↩-607. 10. The lack of conviction on the part of the experts is reflected in the number of times the parties have modified the values they have attributed to the donation. For example, petitioners originally claimed that the value of the donation was $ 350,000, based on the original Tessier appraisal. However, subsequent to the donation, but prior to trial, the Hilborn case was decided. The Tessier appraisal was thereafter revised in light of Hilborn, and was further restricted to the office building, the portion of the Property on which the building was constructed, and the key lot. The Brewster appraisal with respect to the adjacent lot was offered at trial in conjunction with the revised Tessier report. Relying on these reports, petitioners claimed at trial that the value of the donation was $ 215,329. During the trial however, Mr. Tessier admitted that the general diminution in value attributable to the donation could have ranged from 10-15 percent rather than 10 percent as he set forth in his second appraisal. Based on this testimony, petitioners revised their value a third time in the supplemental trial memorandum, and now claim that the fair market value of the donation is $ 239,125. Respondent's alleged value equally has been the subject of modification throughout the proceeding. In the statutory notice, respondent determined that the value of the donation was $ 86,000. In preparation for trial, respondent's expert arrived at a value of $ 150,000. After trial, in the supplemental memorandum, respondent extrapolated from the opinion of petitioners' expert and revised the "before" value of the Property. The overall diminution percentage was then changed from 10 percent to 12-15 percent, and on the basis of these modifications, respondent concludes post-trial that the Property diminished in value between $ 147,000-$ 150,000. ↩
11. Respondent offered an empirical study prepared by Mr. Derbes as evidence of the effect of facade donations on the subsequent sale value of several properties in New Orleans, but we are not convinced that the properties in the study is entirely accurate. Testimony of other witnesses about properties in the study called its accuracy into question sufficiently to cast doubt on its credibility and to cause us to give the study little weight except to support the fact that opinions about the effect of facade donations vary among experts. ↩
12. ↩
Value of Property Before Facade Donation
Derbes
$ 1,000,000
Tessier (1st)
1,222,000
Tessier (2nd) and Brewster
1,217,500
13. In contrast to his testimony, Mr. Derbes' expert report states that the facade donation "may" have had an effect on potential development of both the key lot and the parking area. In the report he calculated an amount for loss of potential development of both areas and included that amount in the value of the facade donation. ↩
14. We note in this respect that we did not rely on the first Tessier report because there is no discussion of the significance of the historic landmark designation in that report. ↩
15. Mr. Derbes' testimony that the property on Magazine and Eighth could not have been developed because of the public's response to the historic landmark designation was pure speculation. Furthermore, it was contradicted by the testimony of Mr. Lary Hesdorffer, a representative of the Historic District Landmark Commission. THE COURT: * * * would the commission have been very strongly concerned with preserving the ability of the public to see that end of the building that faces 8th street without anything in front of it? This obviously would affect the kind of -- THE WITNESS: I can't say that they would absolutely stand in the way of anything being done on the property because it might obstruct the view. More -- it would be more probable that the concern of the commission would be that whatever would be put there or considered for construction would be of materials and a scale and proportion and certain details that would lend itself or, you know, have some compatibility with the original structure. But to say that they would refuse any project simply on the grounds of one elevation -- an elevation to a side street not being visible, I can't say that that would happen.↩
16. See n. 10, supra.↩