# United States Court of Appeals
## For the First Circuit

No. 14-1863

GORDON KAUFMAN; LORNA KAUFMAN,

Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES TAX COURT

[Hon. James S. Halpern, U.S. Tax Court Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Frank Agostino, with whom Tara Krieger, Agostino & Associates, PC, Michael E. Mooney, and Nutter McClennen & Fish LLP were on brief, for appellants.
Patrick J. Urda, Attorney, Tax Division, United States Department of Justice, with whom David A. Hubbert, Deputy Assistant Attorney General, and Jonathan S. Cohen, Attorney, Tax Division, United States Department of Justice, were on brief, for appellee.

April 24, 2015

**LYNCH, Chief Judge**.  This appeal turns on a straightforward question: did the Tax Court clearly err when it found that taxpayers Gordon and Lorna Kaufman must pay penalties for claiming a charitable deduction on their tax returns for a worthless historic preservation easement on their home?  Finding no clear error, we affirm.

The Kaufmans claimed a charitable deduction of $220,800 on their 2003 and 2004 returns.  The deduction corresponded to the purported value of a historic preservation facade easement on their Boston home, which they donated to the National Architectural Trust, since renamed the Trust for Architectural Easements ("the Trust").  The Commissioner of Internal Revenue disallowed the deduction and assessed deficiencies and accuracy-related penalties for both tax years in question.

The Tax Court affirmed the disallowance of the deduction on a motion for summary judgment, holding that the charitable deduction was invalid as a matter of law, see Kaufman v. Comm'r, 134 T.C. 182 (2010) [hereinafter "Kaufman I"], and it reaffirmed this ruling after holding a trial on the remaining issues in the case, see Kaufman v. Comm'r, 136 T.C. 294 (2011) [hereinafter "Kaufman II"].  The Kaufmans appealed to this court, and we vacated the Tax Court's decision and remanded for further proceedings.  See Kaufman v. Shulman, 687 F.3d 21, 33 (1st Cir. 2012) [hereinafter "Kaufman III"].  On remand, the Tax Court found that the value of

-2-

the easement was zero and that the Kaufmans were liable under applicable IRS regulations for a 40% accuracy-related penalty for making a gross valuation misstatement.  Kaufman v. Comm'r, 107 T.C.M. (CCH) 1262 (2014) [hereinafter "Kaufman IV"].

The Kaufmans appeal for a second time.  They do not contest the Tax Court's finding that the value of the easement was zero, but they argue that the court erred in imposing the accuracy-related penalties.  They also advance, for the first time, an argument that the Commissioner did not comply with the procedural requirements of 26 U.S.C. § 6751(b)(1)[1] in assessing those penalties.

We affirm.  The Tax Court's finding that the Kaufmans are liable for accuracy-related penalties was neither clearly erroneous nor infected by any error of law.  The Kaufmans failed to raise their second argument before taking this appeal (or, indeed, at any earlier point in the labyrinthine history of this litigation), and so we deem it waived.

## I.  Facts And Procedural History

A.        The Easement Donation

In 1999, Lorna Kaufman, a company president with a Ph.D. in psychology, bought a single-family residence for herself and her

---

[1]        Unless otherwise noted, all references to Title 26 of the United States Code (the Internal Revenue Code) and to IRS regulations refer to the versions applicable in 2003 and 2004, the tax years at issue.

husband Gordon at 19 Rutland Square in the South End of Boston for just over $1 million.  Kaufman III, 687 F.3d at 22.  The home is subject to certain zoning restrictions by virtue of its location in the South End historic preservation district.  Around October 2003, she and Gordon, an emeritus professor of statistics at MIT, "learned about a tax incentive program for historic preservation" promoted by the Trust, which the Trust represented would allow the couple to qualify for a charitable deduction in the amount of 10-15% of the value of the South End residence.  Id. at 23.  As explained in Kaufman III,

> A provision of the Internal Revenue Code, 26 U.S.C. § 170(h) (2006), creates an incentive for taxpayers to donate real property interests to nonprofit organizations and government entities for "conservation purposes."  . . .  [T]he statute allows taxpayers to claim a deduction for donating a real property interest -- including an easement -- "exclusively for conservation purposes."  These purposes include the preservation of "historically important" land areas or structures.
> The deduction for granting the easement is intended to reflect the value of what the taxpayer has donated which, in the absence of a "market" for such easements, can be measured by "the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction."

Id. (citations omitted).

In December 2003, the Kaufmans entered into a Preservation Restriction Agreement (PRA) with the Trust, which granted to the Trust an "easement in gross, in perpetuity, in, on,

and to the Property, Building, and the Facade" and limited alterations to the property. Under the Trust's system, donors were also required to give a cash contribution to the Trust equal to 10% of the value of the donated easement. Kaufman III, 687 F.3d at 23. The Kaufmans did so.

As the Trust requested, the Kaufmans also sent a form letter in late 2003[2] to their mortgage lender, Washington Mutual Bank, asking it to subordinate its interest in the property to the Trust's easement. Id. at 23-24. The letter stated that the easement "convey[ed] the right of prior approval or [*sic*] any future changes [the owner] wish[ed] to make on the exterior of the property." Significantly, the letter also noted that "[t]he easement restrictions are essentially the same restrictions as those imposed by current local ordinances that govern this property." Gordon later testified that he "[d]idn't notice" the sentence stating that the PRA restrictions were the same as the South End zoning restrictions already in place and that he "made a mistake" in signing the form. He stated that he thought the PRA restrictions were "much tougher," but admitted that he did not compare the two sets of restrictions. Lorna testified similarly, stating that she "probably didn't focus on" the sentence in

---

[2] The letter is undated, but the Kaufmans apparently sent it sometime between October 2003, when they began corresponding with the Trust about the easement donation, and December 2003, when the Kaufmans signed the final PRA.

question and that she believed that granting the easement would subject their home to stricter controls.

In order to obtain a charitable deduction for the donation of the easement, the Kaufmans were required to obtain an appraisal of its fair market value.  See 26 U.S.C. § 170(f)(11). The Trust offered the names of two appraisers it recommended, and the Kaufmans selected Timothy Hanlon.  Kaufman III, 687 F.3d at 24. Hanlon was a certified professional appraiser who managed his own residential appraisal company.  Id.  However, the only appraisals of partial interests in real property that he had done were nine appraisals of the value of facade easements donated to the Trust. As the Tax Court explained, Hanlon had learned to appraise facade easements by speaking with representatives from the Trust, who had told him that "the range of values for facade easements is between 11% for properties in highly regulated areas and ('towards') 15% in less regulated or unregulated areas."  Trust representatives also suggested language for him to include in his appraisals, which Hanlon in fact incorporated "almost verbatim" into all of his reports, regardless of the property involved.

Hanlon's January 2004 appraisal attempted to arrive at the value of the easement through the "before and after" method of valuation, which involved "determining the difference between 'the fair market value of the property prior to donation of the easement and the fair market value of it after donation of the easement.'"

-6-

He determined that the value of the property before the grant of the easement was $1,840,000. He acknowledged that there was "much overlap" between the burdens imposed by the PRA and the burdens imposed by the South End zoning restrictions, but concluded that the PRA restrictions were "stricter." His explanation for why the PRA controls were purportedly stricter, however, was vague, nonspecific, and not entirely logical. A representative excerpt from his report reads as follows:

> The [PRA] easement is granted in perpetuity while the historic district ordinances and local zoning practices may change over time to reflect changes in political, economic and aesthetic needs and tastes in a community. The Historic District ordinances contain relief for economic hardship, which the [PRA] does not. The [PRA] may result in higher insurance and property maintenance costs than those on properties not so encumbered. Rehabilitation costs may be higher also as the property owner could be obligated to restore or replace deteriorated materials rather than replace them with cheaper substitute materials. . . . Marketability could be affected as a segment of the buying public may show resistance to being subjected to yet additional limitations and restrictions on their property rights.

Despite his conclusion that the PRA imposed more robust restrictions on the use of the property than did the South End zoning restrictions, Hanlon also opined that the PRA did not change or inhibit the property's development to its highest and best use as a single-family dwelling.

-7-

Hanlon estimated that the burdens imposed by the PRA would reduce the property's fair market value by 12%, and so he calculated the value of the easement at $220,800. To reach this conclusion, Hanlon relied on a document prepared by IRS employee Mark Primoli stating that "the proper valuation of a facade easement should range from approximately 10% to 15% of the value of the property."[3] Hanlon then made a list of burdens that he believed would affect the value of a property encumbered by a facade easement and assigned a percentage to each such that the percentages added up to 15%. These calculations were based on his "judgment, experience, and . . . 'common sense,'" not on any data or statistical analysis. Kaufman IV, 107 T.C.M. (CCH) 1262, slip op. at 26. He then "adjusted the percentages" to "reflect th[e] differences and similarities" between the South End zoning restrictions and the restrictions imposed by the PRA. Hanlon acknowledged that his method was "unique" and that it was "not a generally accepted appraisal practice or valuation method."

---

[3] The Primoli article, entitled "Facade Easement Contributions," was prepared sometime prior to November 2003 (the record does not disclose the precise date) "as part of an IRS program focusing on specialized areas of tax law." Scheidelman v. Comm'r, 682 F.3d 189, 196 n.5 (2d Cir. 2012). In crafting the article, Primoli had "relied upon a 1994 IRS 'Audit Technique Guide,' used to train tax examiners but not intended to set IRS policy." Id. "In 2003 both the Audit Technique Guide and a revised version of Primoli's article omitted any reference to the ten to fifteen percent range for fear the numbers were being misconstrued." Id. This omission was not mentioned in Hanlon's January 2004 appraisal.

Gordon testified that he thought Hanlon's appraisal "looked like a professionally [*sic*], respectable appraisal by a credentialed appraiser." He sent the appraisal to his longtime accountant, David Cohen. According to Gordon, Cohen replied that "the appraisal looked professional and well done, [and] the results were reasonable." Cohen testified that he "had seen many real estate appraisals" and the Hanlon appraisal "seemed very similar to the other ones [he] had seen." He also stated that he offered the Kaufmans no opinion on whether the magnitude of the easement valuation was reasonable.

A week after receiving Hanlon's appraisal, Gordon e-mailed Mory Bahar, a representative of the Trust. Lorna and Cohen were copied on the e-mail. Gordon expressed concern as to whether "the reduction in resale value of the property due to the easement [would be] so large as to overwhelm the tax savings that accrue from it." He then asked if Bahar had "statistical documentation that bears on how much of a reduction in resale value takes place for residential properties." Gordon also noted Hanlon's statement "that the restrictions imposed by the . . . Trust are much stricter than Boston Landmark's restrictions," and he asked Bahar to "read that section of the appraisal and give me your comments about it."

Bahar's reply to Gordon, copied to Lorna and Cohen, reads, in relevant part, as follows (emphases added):

In areas that are regulated by local historic preservation ordinances and bodies such as Boston historic neighborhoods (including yours) the property owners are not allowed to alter the facade of their historic buildings, whether there is an easement or not. . . . <u>Therefore, properties with an easement are not at a market value disadvantage when compared to the other properties in the same neighborhood.</u> But if the district is not being regulated and historic preservation is not being enforced then the presence of the easement . . . will be viewed negatively by those buyers who would want to change the facade or demolish the building.

<u>And here are some supporting data for that principle:</u>

[] <u>We have tracked 26 resold properties to-date on which we held an easement, and none was resold at a loss or had any issues for resale that we are aware of</u>. . . .

[] Over 100 lenders have approved to subordinate their loans to our easements to-date in over 800 cases. . . . <u>Why would these banks (including yours) approve these transactions if they saw a risk or adverse financial impact on their collateral??</u>

. . . .

[] One of our directors, Steve McClain, owns fifteen or so historic properties and has taken advantage of this tax deduction himself. <u>He would never have granted any easement if he thought there would be a risk or loss of value in his properties</u>.

Gordon testified that he found Bahar's e-mail "only mildly informative because, . . . as a mathematical statistician," he was skeptical of the statistical significance of Bahar's supporting data, and because Bahar was an "agent" of the Trust and so had an interest in convincing Gordon to donate the easement. However, he responded to Bahar, again copying Lorna and Cohen, and

stated that he appreciated the "very detailed reply" and that he would "talk to Dave Cohen about final implementation."

The Kaufmans decided to go forward with the easement donation despite the warning signals in the Bahar e-mail. They spread the $220,800 deduction over two tax years, 2003 and 2004, because they otherwise would have exceeded the statutory limits on deductions in a single year. Kaufman III, 687 F.3d at 24 (citing 26 U.S.C. § 170(b)(1)(E)).

B.     The IRS Investigation And First Round Of Litigation

"In March 2007, evidently as part of a wide-ranging investigation into perceived abuses of the easement program, the IRS opened an investigation into the Kaufmans' claimed charitable deductions." Id.[4] In 2009, the IRS issued deficiencies of $39,081.25 plus $14,535.80 in accuracy-related penalties for 2003, and $36,340.00 plus $14,536.00 in accuracy-related penalties for 2004. The agency disallowed the deductions on two grounds relevant here: (1) they were invalid as a matter of law because the easement conveyance did not comply with relevant regulations, and (2) the

---

[4] The IRS became concerned in the mid-2000s "that individuals and organizations ha[d] been abusing the conservation statute to improperly shield income or assets from taxation." Kaufman III, 687 F.3d at 32 (internal quotation marks omitted) (quoting IRS news releases from 2005 and 2006). In fact, the agency placed historic preservation easements on its "Dirty Dozen" list of tax scams in 2005, 2006, and 2009, and has continued taking steps since then to crack down on abuse of the program. See generally L.J. Kreissl & K.B. Friske, IRS Takes A Hard Stance on Deductions for Conservation Easements, Prac. Tax Strategies, Feb. 2010.

-11-

Kaufmans had not established that the value of the easement was $220,800. Id. at 24-25.

The Kaufmans petitioned for review by the Tax Court, which, on a motion for summary judgment, upheld the IRS's disallowance on ground (1). Kaufman I, 134 T.C. at 187. The court reaffirmed that finding after a trial on other issues in the case. Kaufman II, 136 T.C. at 313. In its post-trial opinion, the Tax Court did not reach the issue of valuation of the facade easement and so did not impose any accuracy-related penalties on the Kaufmans, reasoning that the court should "not now be required to invest the time and effort necessary to resolve the difficult factual questions of intent and value presented by" the IRS's claim that the Kaufmans had acted negligently or unreasonably in claiming the deduction. See id. at 324-26.

The Kaufmans then appealed to this court, challenging the disallowance of the facade easement deduction. We found that the Tax Court erred in disallowing the deduction as a matter of law and vacated that aspect of the decision. Kaufman III, 687 F.3d at 30.[5]

---

[5] The IRS had argued, and the Tax Court had agreed, that the conveyance of the easement did not comply with 26 C.F.R. § 1.170A-14(g)(6), the "extinguishment provision." That provision

> requires that "when a change in conditions gives rise to the extinguishment of a perpetual conservation restriction [by judicial proceeding], the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least

We further explained that, "since the Tax Court's decision not to impose penalties with respect to the [facade easement deduction] depended on the same rationale on which it based its grant of partial summary judgment, . . .  the Tax Court's decision not to impose further penalties on the Kaufmans must be vacated as well." Id. (citations omitted).  We remanded for the Tax Court to consider "the grounds left unaddressed, including the proper value of the easement."  Id. (internal quotation mark omitted).  We also noted that, if the value was determined to be zero, "then the Kaufmans would be liable for penalties under 26 U.S.C. § 6662 . . . unless they could show 'reasonable cause.'"  Id.

C.        The Tax Court's Decision On Remand

          1.      The Easement Valuation

          On remand, the Tax Court, in a thorough analysis, found that the easement's value was zero.  The court accepted Hanlon as

_____

> equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the donor is entitled to the full proceeds from the conversion."

Kaufman III, 687 F.3d at 26 (alteration in original) (quoting 26 C.F.R. § 1.170A-14(g)(6)(ii)).  The Tax Court held that, because the Kaufmans' mortgage lender had retained a "claim to all insurance proceeds . . . and all proceeds of condemnation" superior to the claim of the Trust, the Trust was not guaranteed to receive its due proportion of the proceeds in the event of a condemnation of the Kaufmans' residence.  Id. (alteration in original).  We held that this was error because it was sufficient that the Trust retained a claim to its due proportion of the proceeds as against the owner-donor; the regulation did not require the Trust to have an absolute right to those proceeds as against the rest of the world.  Id. at 27.

-13-

an expert appraiser of partial interests in property but evaluated his testimony with some skepticism given his "closeness to [the Trust] and the singularity of his experience in valuing facade easements for clients and for a patron all interested in establishing high values for the easements." Kaufman IV, 107 T.C.M. (CCH) 1262, slip op. at 46-49. The court ultimately rejected Hanlon's methodology and assumptions as unsupported and unreliable. See id. at 51-54.

Instead, the Tax Court found persuasive the testimony of the IRS's expert, John Bowman. See id. at 57. Bowman, who, like the Tax Court, rejected Hanlon's analysis, see id. at 14, 30-35, opined that the donation of the facade easement would not result in a diminution in property value for several reasons. First, he agreed with Hanlon that after the donation, "there would be no change in the highest and best use of the property." Id. at 14, 36. Second, Bowman found, based on a "component by component" comparison of the South End zoning restrictions with the PRA restrictions, that the latter were "'basically duplicative' of, and 'not materially different' from" the former. Id. at 36, 38; see also id. at 57-63. Finally, relying both on published literature and on his own study of data concerning sales and resales of residential properties in the Boston area, Bowman found no evidence that owners of restriction-encumbered properties have historically had difficulty marketing or financing them or that

restriction-encumbered properties actually sell for less than comparable properties without restrictions.  Id. at 34-36, 39-43. Bowman accordingly concluded that the easement was worthless.  Id. at 43-44.  The Tax Court agreed and sustained the IRS's disallowance of the Kaufmans' charitable deduction for the easement donation.  Id. at 63-64.

2.    The Accuracy-Related Penalties

The court then turned to the issue of penalties.  Before explaining the Tax Court's findings, we provide an overview of the relevant statutory provisions.  Section 6662 of the Internal Revenue Code imposes a penalty equal to 20% of any underpayment of income tax due to, among other things, "[n]egligence or disregard of rules or regulations," "[a]ny substantial understatement of income tax," or "[a]ny substantial valuation misstatement."  26 U.S.C. § 6662.[6]  In the case of a "gross valuation misstatement," defined as a 400% or more overstatement of the value of any property claimed on a tax return, the penalty is increased to 40% of the underpayment.  Id. § 6662(h).  "The value . . . claimed on a return of any property with a correct value . . . of zero is considered to be 400% or more of the correct amount," and the

_____

[6]    A "substantial understatement of income tax" is defined as at least 10% of the actual amount of the tax or $5,000, whichever is greater.  26 U.S.C. § 6662(d)(1)(A).  A "substantial valuation misstatement" occurs if "the value of any property . . . claimed on any return of tax . . . is 200 percent or more of the amount determined to be the correct amount of such valuation."  Id. § 6662(e)(1)(A).

applicable penalty is 40%.  26 C.F.R. § 1.6662-5(g).  Only one accuracy-related penalty may be assessed with respect to a given underpayment, even if the underpayment is subject to a penalty on multiple grounds.  See id. § 1.6662-2(c).

There are exceptions to imposition of penalties.  Section 6664(c) sets forth a "reasonable cause exception" for underpayments.  It provides, in relevant part:

> (1) In general. No penalty shall be imposed . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.
> (2) Special rule for certain valuation overstatements.  In the case of any underpayment attributable to a substantial or gross valuation overstatement . . . with respect to charitable deduction property, paragraph (1) shall not apply unless--
>> (A) the claimed value of the property was based on a qualified appraisal made by a qualified appraiser, and
>> (B) in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property.

26 U.S.C. § 6664(c). The regulations instruct that "[t]he determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances," including, inter alia, the taxpayer's "experience, knowledge, and education"; whether the taxpayer relied on an appraisal, and if so, whether such reliance was reasonable and in good faith; and whether the taxpayer relied

-16-

on information in a W-2 or other tax form, provided that the "taxpayer did not know or have reason to know the information was incorrect."  26 C.F.R. § 1.6664-4(b)(1).

The Tax Court found the Kaufmans liable for a 40% penalty for a gross valuation misstatement because they claimed a deduction for the donation of a facade easement whose true value was zero. Kaufman IV, 107 T.C.M. (CCH) 1262, slip op. at 66-67.  The court further determined that the "reasonable cause" exception was not applicable.  That was because, although the first prong of the test was met, that is, "the reported value of the easement was based on a qualified appraisal made by a qualified appraiser," the second prong was not, that is, the Kaufmans had not made a good faith investigation of the easement's value.  Id. at 71-75.  The court explained that "there is no evidence that, other than consulting Mr. Bahar" -- who in fact told them that the donation of the easement would not reduce the value of their home -- the Kaufmans "made any independent investigation of the value of the facade easement, much less an investigation confirming that its value was the value they reported on the 2003 and 2004 returns, viz, $220,800."  Id. at 75.  In a separate analysis, the court also found, for essentially the same reason, that the Kaufmans had not acted with reasonable cause and in good faith.  Id. at 76-81.[7]

_____

[7]    The Tax Court held in the alternative that the Kaufmans were liable for a 20% penalty for substantial understatement of income tax and negligence.  Kaufman IV, 107 T.C.M. (CCH) 1262, slip

This appeal followed.  The Kaufmans challenge the Tax Court's finding that they are liable for accuracy-related penalties.  They have not, however, appealed the court's finding that the actual value of the easement was zero.

II.   Penalty For Gross Valuation Misstatement

A.    Standard Of Review

The parties agree that "[o]ur review of the tax court's ruling is 'in most respects similar to our review of district court decisions: factual findings for clear error and legal rulings de novo.'"  Schussel v. Werfel, 758 F.3d 82, 87 (1st Cir. 2014) (quoting Drake v. Comm'r, 511 F.3d 65, 68 (1st Cir. 2007)).  "The Tax Court has the primary function of finding the facts in tax disputes, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which it considers most reasonable," and we  "have no power to change or add to those findings of fact or to reweigh the evidence." Scheidelman v. Comm'r, 755 F.3d 148, 151 (2d Cir. 2014) (per curiam) (quoting Comm'r v. Scottish Am. Inv. Co., 323 U.S. 119, 123-24 (1944)) (internal quotation marks omitted).

In turn, "[t]he determination that a taxpayer is liable for an accuracy-related penalty is [] a factual determination reviewed for clear error." Curcio v. Comm'r, 689 F.3d 217, 225 (2d

op. at 81-86.  Because of our disposition of this case, we need not address these rulings.

-18-

Cir. 2012); accord Daoud v. Comm'r, 548 F. App'x 441, 441 (9th Cir. 2013); Rovakat, LLC v. Comm'r, 529 F. App'x 124, 128 (3d Cir. 2013); Stobie Creek Invs. LLC v. United States, 608 F.3d 1366, 1381 (Fed. Cir. 2010); see also Kikalos v. Comm'r, 434 F.3d 977, 986-87 (7th Cir. 2006); cf. United States v. Boyle, 469 U.S. 241, 249 n.8 (1985) ("Whether the elements that constitute 'reasonable cause' are present in a given situation is a question of fact, but what elements must be present to constitute 'reasonable cause' is a question of law.").

Specifically, courts have treated the issue of whether a taxpayer acted in "good faith" for purposes of the good faith investigation requirement and the reasonable cause and good faith exception as an issue of fact appropriately reviewed for clear error. See Whitehouse Hotel Ltd. P'ship v. Comm'r, 755 F.3d 236, 247-50 (5th Cir. 2014). This makes particularly good sense, including in the context of this case. The Tax Court, which heard firsthand the evidence -- including, importantly, the testimony of the Kaufmans themselves and their accountant -- was in the best position to make the determination of whether the taxpayers acted in good faith. See Frank Sawyer Trust of May 1992 v. Comm'r, 712 F.3d 597, 606 (1st Cir. 2013) ("[D]eferential clear error review is especially appropriate when -- as here -- knowledge and intent are pivotal to the Tax Court's ruling and credibility determinations comprise a prime element of the court's ultimate conclusion."

-19-

(quoting <u>Crowley</u> v. <u>Comm'r</u>, 962 F.2d 1077, 1080 n.4 (1st Cir. 1992)) (internal quotation marks omitted)).

B.        <u>Analysis</u>

    1.        <u>The Tax Court's Holding That The Kaufmans Did Not</u>
           <u>Conduct A Good Faith Investigation</u>

After a careful review of the record, we cannot say that the Tax Court's finding that the Kaufmans failed to make a good faith investigation into the value of the easement was clearly erroneous. Indeed, the conclusion was well supported by the evidence. Specifically, it was clearly reasonable for the court to conclude that events after the Kaufmans' receipt of Hanlon's appraisal would have put a reasonable person on notice that further investigation was required to verify the purported value of the donated easement. After receiving Hanlon's appraisal, Gordon, expressly concerned that the donation of the easement to the Trust might hurt the market value of the house, e-mailed Bahar for reassurance, and Bahar unequivocally told him that he did not expect the donation to decrease the value of the residence at all. This should have immediately raised red flags as to whether the value of the easement was zero. Yet the evidence shows Gordon made an immediate decision to press ahead with the donation after Bahar's reassurance that it would not hurt the value of the residence. Moreover, the Kaufmans had signed a letter stating that the restrictions imposed by the PRA were the same as those already

in place on the residence by virtue of the South End zoning restrictions.

The Tax Court was entitled to reject as not credible Gordon's testimony that he did not put much stock in Bahar's assessment of the effect of the easement donation on the value of the property.[8] It was also entitled to reject the Kaufmans' testimony that they did not notice the language about the easement restrictions in the letter they sent to Washington Mutual. And, even accepting that testimony, it was within the Tax Court's purview to find that the Kaufmans should have done further investigation and that they failed to do so.

The Kaufmans' protestations that they were unable to critically evaluate the Hanlon appraisal because they were not experts in easement valuation are beside the point. The Tax Court did not suggest that the Kaufmans should have been able to critique the Hanlon appraisal in a vacuum, or that they should have known from the outset that the value of the easement was zero. Rather,

---

[8] Gordon's testimony that he discounted Bahar's analysis because it was not sufficiently statistically rigorous could easily be doubted. It was also striking in its self-contradiction. This statement is belied by Gordon's failure to apply the same statistical rigor to Hanlon's analysis, which was not based on any statistical analysis at all -- just Hanlon's judgment, experience, and "common sense." Kaufman IV, 107 T.C.M. (CCH) 1262, slip op. at 26. Indeed, Gordon admitted that he had no basis upon which to accept Hanlon's analysis other than the fact that Hanlon was a professional appraiser, and that he could not judge the accuracy of Hanlon's 10-15% range because "to judge its accuracy you would have to see the sample data on which it was based." Id. at 79.

the court found that the Kaufmans should have recognized obvious warning signs indicating that the appraisal's validity was subject to serious question, and should have undertaken further analysis in response.

The Kaufmans also miss the mark in arguing that it was conventional wisdom during the tax years in question that a conservation easement, in general, would decrease the value of a piece of property. The IRS regulations themselves reject any notion that the grant of a conservation easement itself affects the fair market value. As the Scheidelman court observed,

> [t]o the contrary, the regulations provide that an easement that has no material effect on the obligations of the property owner or the uses to which the property may be put "may have no material effect on the value of the property." And sometimes an easement "may in fact serve to enhance, rather than reduce, the value of the property. In such instances no deduction would be allowable."

Scheidelman, 755 F.3d at 152 (footnote omitted) (quoting 26 C.F.R. § 170A-14(h)(3)(ii)); see also id. at 152 n.1 (noting that "[t]his is especially true if only a simple facade easement has been granted over a property that has substantial market value because of its historic character" (alterations, citation, and internal quotation marks omitted)). Moreover, "neither the Tax Court nor any Circuit Court of Appeals has held that the grant of a conservation easement effects a per se reduction in the fair market value." Id. at 152 (alteration in original) (citations and

-22-

internal quotation marks omitted); see also Nicoladis v. Comm'r, 55 T.C.M. (CCH) 624 (1988) (disclaiming adoption of any "general '10-percent rule' . . . with respect to facade donations").

The Tax Court did not purport to equate "good faith investigation" with "exhaustive investigation." It merely required that the Kaufmans do some basic inquiry into the validity of an appraisal whose result was squarely contradicted by other available evidence glaringly in front of them. There was no clear error in such reasoning.

The Kaufmans also argue that they must be found to have acted in good faith because they reasonably relied on their accountant, Cohen, who reviewed the Hanlon appraisal and expressed no reservations about the Kaufmans taking the easement deduction. But Cohen testified that he offered the Kaufmans no opinion on whether the easement valuation was reasonable or not.[9] And so, reliance on Cohen could not, by definition, constitute a "good faith investigation of the value of the contributed property," 26 U.S.C. § 6664(c)(2)(B) (emphasis added), particularly given the other information available to the Kaufmans that cast doubt on the validity of the appraisal.

---

[9]    Gordon testified that Cohen said the results of the Hanlon appraisal were "reasonable." But the Tax Court, as factfinder, was entitled to weigh the credibility of the conflicting testimony, and to credit Cohen's testimony over Gordon's. See Frank Sawyer Trust, 712 F.3d at 606.

The Fifth Circuit's decision in <u>Whitehouse</u>, upon which the Kaufmans rely, is not to the contrary and is consistent with our conclusions. There, the taxpayer had relied on two appraisals, and moreover, the valuations were much more complicated because many issues were in dispute, including the property's boundaries, its highest and best use, and how the donation of the easement would affect the highest and best use. <u>See</u> <u>Whitehouse</u>, 755 F.3d at 239-41, 247-48, 250. Most importantly, there is no indication that the taxpayer in <u>Whitehouse</u> encountered "red flags" suggesting that the easement had no value.

The Kaufmans mistakenly attempt to rely on the Tax Court's decision in <u>Chandler</u> v. <u>Commissioner</u>, 142 T.C. 279 (2014). It is also distinguishable. There, as here, the taxpayers relied on an appraisal and the advice of their accountant. <u>Id.</u> at 295. Unlike in this case, there were no "red flags" analogous to the Bahar e-mail or the Washington Mutual letter. Indeed, the <u>Chandler</u> court expressly distinguished this case on that precise basis. <u>See</u> <u>id.</u> (noting that <u>Kaufman</u> involved "different circumstances," namely, "[t]he taxpayers' continued reliance on the initial appraisal in the face of [Bahar]'s comments"). Such "red flags" were likewise missing from the other cases cited by the Kaufmans. <u>See</u> <u>Zarlengo</u> v. <u>Comm'r</u>, 108 T.C.M. (CCH) 155 (2014); <u>Scheidelman</u> v.

<u>Comm'r</u>, 100 T.C.M. (CCH) 24 (2010), <u>vacated and remanded</u>, 682 F.3d 189 (2d Cir. 2012).[10]

2.  <u>The Tax Court's Alternate Holding That The Kaufmans Did Not Act With Reasonable Cause And In Good Faith</u>

The Tax Court also did not clearly err in finding, as an alternate holding, that the Kaufmans did not satisfy the reasonable cause and good faith exception, for the same reasons already discussed.  "Generally, the most important factor" in the reasonable cause and good faith determination "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." 26 C.F.R. § 1.6664-4(b)(1).  Courts should "tak[e] into account all pertinent facts and circumstances," "including the experience, knowledge, and education of the taxpayer."  <u>Id.</u>  The Kaufmans were highly intelligent, very well-educated people, and the Tax Court reasonably found that developments casting doubt on the Hanlon appraisal should have alerted them that they needed to take further steps to assess their "proper tax liability."

Moreover, and importantly for our purposes,

---

[10]  We also note that, because of the applicable standard of review, the cases cited by the Kaufmans in which the Tax Court found that the taxpayer acted in good faith are of limited help to the Kaufmans.  Even if the Kaufmans were identically situated to the taxpayers in those cases (and they are not), and even if the Tax Court's findings on the good faith issue in those cases would have been affirmed on appeal as not clearly erroneous, it would not logically follow that the Tax Court clearly erred in finding a lack of good faith in this case.

-25-

> [r]easonable cause and good faith ordinarily
> is not indicated by the mere fact that there
> is an appraisal of the value of property.
> Other factors to consider include the
> methodology and assumptions underlying the
> appraisal, the appraised value, the
> relationship between appraised value and
> purchase price, the circumstances under which
> the appraisal was obtained, and the
> appraiser's relationship to the taxpayer or to
> the activity in which the property is used.

26 C.F.R. § 1.6664-4(b)(1). Hanlon's assumptions and methodology were questionable at best, and the appraisal value was suspiciously high in view of other evidence available to the Kaufmans. Further, Hanlon at least arguably had an incentive to calculate a high value for the easement, given that he performed appraisals for the Trust and the Trust received cash donations corresponding to a set percentage of the assessed value of the donated easements, see Kaufman III, 687 F.3d at 32. In view of these facts, the Tax Court did not clearly err in concluding that the Kaufmans' reliance on Hanlon's appraisal was not sufficient to satisfy the reasonable cause and good faith exception.

### 3.    The Kaufmans' Remaining Arguments

The Kaufmans advance three additional arguments in an effort to show that the Tax Court's analysis was infected by legal error. We address and reject each in turn.

First, the Kaufmans argue that the IRS did not meet its burden of production to impose any penalty. Not so. In addition to the basic underlying facts, the IRS submitted the expert

testimony of Bowman, who concluded, based on market research and a comparison of the South End zoning restrictions with the restrictions imposed by the PRA, that the value of the easement was zero. The Kaufmans criticize Bowman for not relying on "contemporary comparable sales data to determine the 'after' value," but they concede elsewhere that this sort of data was "nonexistent" and that accordingly it was reasonable to compare the South End zoning restrictions with the PRA restrictions to arrive at a valuation of the easement. Bowman's testimony, while not compelling a finding that the value of the easement was zero, certainly heavily supported such a finding -- a point the Kaufmans seem to have implicitly conceded by their decision not to challenge the Tax Court's valuation of the easement.

Second, the Kaufmans argue that the Tax Court employed an erroneous definition of the term "good faith." The court used the phrase "honesty in belief" and required the Kaufmans to "demonstrate how they honestly came to believe that, beyond being simply the amount determined in the Hanlon appraisal, the value of the facade easement was $220,800." Kaufman IV, 107 T.C.M. (CCH) 1262, slip op. at 72. The Kaufmans contend that this "is an impossibly high standard of proof" and that "[a] more suitable definition for good faith . . . would be the absence of 'bad' faith -- that is, the absence of 'dishonesty of belief or purpose.'" At oral argument, counsel for the Kaufmans framed this argument

somewhat differently, asserting that the Tax Court employed an overly "subjective" standard in evaluating the Kaufmans' good faith.

The Kaufmans' proposed objective/subjective distinction is unhelpful and not supported by the text of the regulations. The inquiry must necessarily be somewhat subjective, since courts must consider "the experience, knowledge, and education of the taxpayer." 26 C.F.R. § 1.6664-4(b)(1); see also id. (providing that "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances" may be indicative of reasonable cause and good faith (emphasis added)). At the same time, the inquiry is not entirely subjective, as the regulations instruct courts to consider whether the taxpayer would "know or have reason to know" that information on which he or she relied was incorrect. Id. (emphasis added). The more helpful framing of the issue is that set forth in the regulations: whether, "taking into account all pertinent facts and circumstances," the taxpayer acted in good faith. Id. That is the standard the Tax Court used.

Turning to the argument in the Kaufmans' brief, the contention that the "honesty in belief" standard is "impossibly high" is undercut by the fact that the Tax Court has in fact recently applied that definition of "good faith" in a case in which it found in favor of the taxpayers. See Zarlengo, 108 T.C.M. (CCH) 155, slip op. at 57-58. Importantly, Black's Law Dictionary

-28-

seemingly treats both definitions as paths to reach a finding. It defines "good faith" as having several components: "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." Black's Law Dictionary 808 (10th ed. 2014) (emphases added).[11]

Third, the Kaufmans make an argument that obtaining a qualified appraisal made by a qualified appraiser "[a]utomatically" constitutes a good-faith investigation. This interpretation of the statute cannot be correct. Section 6664(c)(2) sets forth two separate requirements that must be met in order for the reasonable cause exception to apply to a gross valuation overstatement: "(A) the claimed value of the property was based on a qualified appraisal made by a qualified appraiser, and (B) in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property." The

_____

[11]    Insofar as the Kaufmans mean to argue that it would be error to require them to determine that the easement was worth precisely $220,800 -- as opposed to, say, $215,000 (or $220,799) -- we do not understand the Tax Court's opinion to require that level of precision. The court's analysis, considered as a whole, suggests that it merely required that the Kaufmans, after a good-faith investigation of the value of the easement, believe that Hanlon's appraisal was reasonably accurate. Cf. Fire & Police Pension Ass'n of Colo. v. Simon, 778 F.3d 228, 241 n.5 (1st Cir. 2015) (citing Connor B ex rel. Vigurs v. Patrick, 774 F.3d 45, 54 n.9 (1st Cir. 2014)).

Kaufmans' reading would render the second requirement meaningless, in violation of the rule that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause is rendered superfluous, void, or insignificant." Young v. United Parcel Serv., Inc., 135 S. Ct. 1338, 1352 (2015) (citations and internal quotation marks omitted) (declining to read the second clause of the Pregnancy Discrimination Act as "simply defin[ing] sex discrimination to include pregnancy discrimination" because "[t]he first clause accomplishes that objective").

Simply obtaining an appraisal is not the same as reasonably relying on that appraisal. The Kaufmans concede as much in their reply brief, acknowledging that "'obtaining' a qualified appraisal alone will not satisfy the good-faith investigation requirement, nor will 'unreasonable' reliance." There may well be situations in which the taxpayer need do little more than read an appraisal and note that there is no other evidence that reasonably casts doubt on the accuracy of the appraisal. Here, however, the Tax Court supportably found that the Kaufmans obtained a qualified appraisal from a qualified appraiser, but that other facts available to the Kaufmans should have alerted them that it was not reasonable to rely on that appraisal.

The Tax Court's analysis with respect to the accuracy-related penalties was sound as a legal matter and not clearly erroneous as a factual matter.

### III. Compliance With 26 U.S.C. § 6751

The Kaufmans also argue, for the first time on appeal, that the Commissioner's assessment of the accuracy-related penalties did not comply with 26 U.S.C. § 6751(b)(1), which provides that no tax penalty "shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary [of the Treasury] may designate."[12] We do not consider this argument because it was not preserved.

We generally treat arguments not raised below as waived. E.g., Anderson v. Hannaford Bros. Co., 659 F.3d 151, 158 n.5 (1st Cir. 2011). The Supreme Court has recognized the wisdom of this rule in the specific context of appeals from tax courts, noting that the practice "is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide" and "in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." Hormel v. Helvering, 312 U.S. 552, 556 (1941).

---

[12] The Commissioner disputes the accuracy of this assertion as a matter of fact.

The Kaufmans acknowledge that they did not raise this argument below but urge us to consider it notwithstanding that general rule because it "involves a question of law and facts that are not in dispute." As the government explains, that is wrong; the question of whether the requirements of § 6751(b)(1) were in fact met in this case is a question of fact, the resolution of which would require further development of the record.

The Kaufmans contend in their reply brief that it was the IRS's burden to show that the requirements were met, and that the Commissioner cannot now "enlarge the record to demonstrate compliance with section 6751." But the question whose burden it was to show compliance with § 6751 is beside the point. The Kaufmans had the responsibility of arguing in the Tax Court that the Commissioner had not complied with the statute in order to put the Commissioner on notice that the issue was in dispute. Having failed to make that argument below, the Kaufmans cannot now fault the Commissioner for introducing no evidence to rebut it. See Hormel, 312 U.S. at 556.

## IV. Conclusion

The judgment of the Tax Court is affirmed.